### G. N. WILCOX *vs.* A. G. ELLIS.

APPEAL FROM DECISION OF THE CHANCELLOR.

APRIL TERM, 1885.

JUDD, C. J.; McCULLY and AUSTIN, JJ.

A sale of shares of stock set aside for the fraud of the seller; it appearing that the seller made false representations as to the value of the stock, intending that the buyer should act upon them, and the buyer acted upon them, although he could, by diligent enquiry, have ascertained that they were untrue.

OPINION OF THE CHANCELLOR APPEALED FROM.

THIS is a bill to declare fraudulent and void a sale made by defendant to plaintiff of sixty shares of the capital stock of the Ho-

nolulu Ice Company, a corporation under Hawaiian law, at $79 per share, and also for an injunction to restrain defendant from taking out an execution upon a judgment for $4,200 obtained by the defendant against the plaintiff at the last July term of this Court for the purchase money of this stock.

The bill charges that the fraud was accomplished by misrepresentation and by the concealment of material facts. The misrepresentation is charged to be statements made by defendant that the stock was good, marketable stock and a first-rate investment at the price offered, and that the President of the Ice Company, S. G. Wilder, who was the principal owner of its stock, held it at par ($100) and refused to sell for less.

The concealment is charged to be of the fact that the stock was unsaleable, and was by reason of an expected competition in the ice business of greatly less value than par.

Taking up first the second point, I think it is proved by the evidence that at the time of the sale of the stock, April 10, 1884, Ellis knew that the new ice company was about to be formed. This is clear from the evidence of Mr. Sass, the projector of the company, who says he told Ellis all about it just previous to his going to San Francisco, about the last of March. Also that Wilcox did not know of it until he heard of it from Mr. W. O. Smith, on April 10th, immediately after his purchase of the stock.

Was Ellis under any legal obligation to disclose this information to Wilcox ? By the authorities he was not. Chancellor Kent's statement of the law in this regard is as favorable to the plaintiff as any. He says : " When, however, the means of information relative to facts and circumstances affecting the value of the commodity, be equally accessible to both parties and neither of them does or says anything tending to impose upon the other, the disclosure of any superior knowledge which one party may have over the other, as to those facts and circumstances, is not necessary to the validity of the contract. There is no breach of any implied confidence that one party will profit by his superior knowledge as to facts and circumstances open to the observation of both parties, or equally within the reach of their ordinary diligence, because neither party reposes in any such confidence, unless it be specially tendered or required. Each one, in ordinary cases, judges for

himself, and relies confidently, and perhaps presumptuously, upon the sufficiency of his own knowledge, skill and diligence. The common law affords to every one reasonable protection against fraud in dealing; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." 2 Kent Com., p., 484.

The possibility of competition in the business of ice-making is one of the chances to which all business ventures are subject. Mr. Sass had caused to be published in the *Daily Bulletin* of 31st March an extended account of it, ending with the statement: "Mr. Sass leaves by the *Alameda* to purchase the necessary machinery."

Pomeroy says (Sec. 904, 2 Pomeroy Eq. Jur.) that a broader duty to disclose material facts rests upon the vendor than on the vendee. "In ordinary contracts of sale where no fiduciary relation exists, and where no confidence, expressed or implied, growing out of or connected with the very transaction itself, is reposed on the vendor, and the parties are dealing with each other at arm's length, and the purchaser is presumed to have as many reasonable opportunities for ascertaining all the facts as any other person in his place would have had, then the general doctrine above stated applies; no duty to disclose material facts known to himself rests upon the vendor; his failure to disclose is not a fraudulent concealment."

There was no fiduciary relation existing between Ellis and Wilcox. Nor is there any evidence that Wilcox expressly reposed confidence in Ellis in this transaction. So far from this being the case, Wilcox says he was bored by Ellis' importunity and that he made the offer to get rid of him, not expecting that it would be taken. The parties were at arm's length. Wilcox was not seeking investments, and was, so to speak, surprised into the sale.

Mr. Justice Story says (2 Eq. Jur., Sec. 204) in speaking of undue concealment or *suppressio veri*, "It is not every concealment even of facts material to the interests of a party which will entitle him to the interposition of a Court of Equity. The case must amount to the suppression of facts which one party, under

42

the circumstances, is bound in conscience and duty to disclose to the other party, and in respect to which he cannot innocently be silent." And in Sec. 205: "The question is not whether an advantage has been taken, which in point of morals is wrong, or which a man of delicacy would not have taken. But it is essentially necessary, in order to set aside the transaction, not only that a great advantage should be taken, but also that there should be some obligation on the party to make the discovery." Sec. 207: "The true definition, then, of undue concealment, which amounts to fraud in the sense of a Court of Equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate to the other, and which the latter has a right not merely *in foro conscientiæ* but *juris et de jure* to know."

And I gather from all the authorities that a sale of goods is not rendered invalid if the vendor has actual knowledge from private sources of facts or events—which are called extrinsic circumstances—not known to the other party, which materially affect the price of goods. Story says where the intelligence is not equally accessible to both parties, equity will not relieve, if it is not a case of mutual confidence. Id. Sec. 149. See *Laidlaw vs. Organ*, 2 Wheaton, 178, and *Mathews vs. Bliss*, 22 Pick, 48.

The rule, as I have expressed it, is subject to qualification; for if there be any fraudulent suggestion or representation, then the transaction becomes tainted with fraud.

On the ground of undue concealment, therefore, I think the bill fails.

In regard to the statements by Ellis, that it was good, marketable stock, etc., I should say that this was a mere matter of opinion, and as such is not relievable in equity, where, as in this case, the parties were dealing with each other upon equal terms.

I pass now to the principal allegation upon which relief is asked for.

Wilcox testified that Ellis, after expatiating on the value of the stock, said that Wilder considered it a first rate investment, and would not sell at less than par. He spoke of him as being President (of the company) and holding most of the stock. He said also that he would not have risked the offer he made of $70 per

share, if he had known that Wilder's reason for refusing to sell at par was that he would not cause others to lose by him.

Mr. Wilder testified that he had frequently stated that any stocks he was holding that were good he should keep, and if he knew a stock was not good he would not stick his friends with it, and this applied to the stock in the Honolulu Ice Company.

Mr. Ellis, in his answer, denies that he said to Mr. Wilcox that Wilder held his stock at par and refused to sell for less, but says that he answered Wilcox's inquiry as to whose the shares were, that they were Foster's, and Wilcox asked : " Are you not selling for Wilder, and do you not think I could buy of Wilder for less than $85 ? " Ellis replied that he offered to sell for Wilder, but that Wilder was unwilling to sell for less than par.

Mr. Wilder says further that he never offered to sell any of his shares in this company. " Don't remember if Ellis offered to sell any for me. He may have asked me if I had any for sale. I have never sold any or offered any for sale."

It seems to me that the inference from Mr. Wilder's testimony is not that he would not sell for less than par because the stock was then worth at least par. He was unwilling to sell at all, while the enterprise was in a condition of uncertainty. And I think Mr. Ellis used the language attributed to him by Wilcox, and that he intended to convey the idea to Wilcox that Wilder considered it of that value, and thus to induce Wilcox to purchase. Mr. Wilder says that if the opposition started, the stock in his company, owing to the limited demand for ice in this community, would be of no value as an investment, but without the opposition it would pay say 10 per cent.; that he had doubts as to the starting of the new company, until Mr. Sass returned from California with his machinery, for he thought no man would be foolish enough to start a new ice machine here.

Pomeroy says (Sec. 876) a misrepresentation, in order to constitute fraud, must contain the following essential elements : (1) Its form, as a statement of fact, as distinguished from a mere opinion. (2) Its purpose of inducing the other party to act, the general presumption being that a misrepresentation has such a design. (3) Its untruth. (4) The knowledge or belief of the party making it. (5) The effect of the misrepresentation, i. e.,

the belief, trust and reliance of the one to whom it is made.
(6) Its materiality.   And (under 5) the party must be justified in
relying upon the representation.   Here the party is not justified
in relying upon the representation, if he actually resorts to the
proper means of ascertaining the truth, or when, having the op-
portunity of making such examination, he is charged with the
knowledge he might have had, if he had prosecuted it with dili-
gence, or when the representation is concerning generalities
equally within the knowledge or means of acquiring knowledge
possessed by both parties.   But where the representation is con-
cerning facts of which the party has, or is supposed to have
knowledge, and the other party has no such advantage, then he
is justified in relying upon the statement.

I find a note to Benjamin on Sales, Sec. 430, as follows: "Mere
statements of a vendor, either of real or personal property, not
being in the form of a warranty, as to its value, price which he
has given or been offered for it, are held to be immaterial,"
citing :

*Medbury vs. Watson,* 6 Met., 259 ; *Brown vs. Castles,* 11 Cush.,
350 ; *Veasey 'vs. Doton,* 3 Allen, 381 ; *Cooper vs. Lovering,* 106
Mass., 79 ; *Mooney vs. Miller,* 102 Mass., 217 ; *Williams vs. Ran-
dall,* 63 Me., 81 ; *Comer vs. Perkins,* 123 Mass., 431.   "But the
utmost limit of this rule has been reached in applying it to state-
ments of the price paid by the person himself."

In this note a leading case in Massachusetts, *Medbury vs. Wat-
son,* 6 Met., 246, is incorrectly stated as an authority to sustain
the view that an action for false and fraudulent representations as
to the price paid by a third person for the property in question,
can be maintained.   A careful reading of the case will show that
an action of trespass on the case was brought, not against the
vendor, but against a third person, who made the false represent-
ations, and the Court say that "naked assertions by the vendor,
though known to be false, are not actionable.   When a vendor of
real estate affirms to the vendee that his estate is worth so much,
that he gave so much for it, or has refused so much for it, such
assertions, though known by him to be false, and though uttered
with a view to deceive, are not actionable.   They are the mere
affirmations of the vendor, on which the vendee cannot safely

place confidence, and will not excuse the neglect in not examining for himself and ascertaining what the facts are, and what credit is to be given to the assertions." This is qualified later on, and the Court say that "fraudulent misrepresentations of particulars in regard to the estate, which the buyer has not equal means of knowing, and where he is induced to forbear inquiries that he otherwise would have made, are not to be viewed in the light of assertions *gratis dicta*, and are actionable."

In *Cooper vs. Lovering*, the Court say, to support an action of deceit, the misrepresentation must be of a material fact, not within the observation of the other party. The latest Massachusetts case I have seen is *Homer vs. Perkins*, 124 Mass., 431. The Court say, if the representation was a mere affirmation or expression of opinion in regard to the value of the property he is attempting to sell, these can never be safely relied upon by the other party. But if it was intended to be the statement of a fact, to be understood and relied upon as such, the action would lie. Citing *Manning vs. Albee*, 11 Allen, 520, where a false representation was made, not only as to the value of the bonds offered, but also as to the sales of such bonds in the market at a certain price, appearing by a public list of sales of stocks, which was exhibited as actually having taken place, and the action was maintained. The Court say in this case that "the representation was one which the plaintiff is not shown to have had equal means of knowing the truth or untruth of, and on which he might without imputation rely."

In *Mooney vs. Miller*, Chapman, C. J., says: "If false representations relate to material facts not within the observation of the opposite party, and are made with intention to deceive, they are actionable; but if the truth can be ascertained by ordinary diligence they are not actionable."

In New York State the law is similarly held. *Miller vs. Barber*, 66 N. Y., 567. Judge Folger says: "The representation of the value of the invention was connected with a false representation of an extrinsic fact calculated to impose upon the plaintiff, to put him off his guard, and to induce him to give credit to the representation of value. It had the effect it was designed to have. He relied, in taking stock, in part upon the supposed

judgment of other persons who, as he was falsely informed, had taken a stock in the company.

This case bears a close resemblance to the one at bar. Ellis represented that Wilder, the President of the Ice Company, and principal owner, would not sell his stock for less than par, meaning to influence Wilcox to buy upon Wilder's judgment of the value of the stock that it was worth par, whereas Wilder would not sell at all. In the New York case the seller mentioned the names of persons who had taken stock in the company; these had allowed their names to be used as subscribers for stock, and had given notes for the amounts subscribed for, upon the secret agreement that the notes should thereafter be given up without payment. No exercise of diligence on the buyer's part would be likely to reveal the fraud, for the conspirators would not disclose their fraud to the intending buyer. Whether it was Wilcox's duty to make inquiries of Wilder to ascertain whether Ellis' statement was true or not is the remaining difficult point to be decided.

It will be noticed that in many of the above quoted cases the Court say that "the fact misrepresented must be one which the buyer has not equal means of knowing," or a fact "not within the observation of the other party," or a fact which could not be verified "by the exercise of ordinary diligence," etc.

The leading case on misrepresentation in England is *Attwood vs. Small*, 6 Clark and Finnelly (House of Lords). Lord Lyndhurst says: "Where representations are made with respect to the nature and character of the property, which is to become the subject of purchase, affecting the value of that property, and those representations turn out to be incorrect and false, to the knowledge of the party making them, in a court of equity a foundation is laid for setting aside the contract which was founded on a fraudulent basis." He quotes from *Dobell vs. Stevens*, 3 B. & C., 623. Here the purchase was of a public house. A false representation was made by the vendor with respect to the extent of the custom, with respect to the quantity of the beer that was drawn during a certain period. The books were in the house; it was part of the case that the purchaser might have had access to them if he thought proper; but notwithstanding that circum-

stance, it being proved the representation was false, the action was sustained.

Lord Wynford says, on p. 502, *id.*: "I am aware that if a person chooses to trust to the representations, and does not make any inquiry, that reliance will be sufficient to make out a charge of false representations as to set aside the contract." If the party thinks proper to inquire, etc., it will be otherwise.

Judge Cooley on Torts, p. 499, says: " Where one in selling personal property makes positive statements of material facts upon which the other relies, the vendor is held to the truth of the representations," etc. Judge Cooley, however, admits that there are cases to the contrary.

In *Holbrook vs. Connor*, 60 Me., 578, it was held, by a bare majority of the Court, that false and fraudulent representations to a purchaser of the value of lands, as to the price he paid for it, etc., are not actionable, because the purchaser is not justified in placing confidence in them.

So, also, in *Bishop vs. Small*, 63 Me., 12 : " Misrepresenta- tions either as to what a patent right cost a vendor, or was sold for by him, or as to offers made for it, or profits that could be made from it, etc., are not actionable."

When it is considered that these representations, not being specific, were not capable of being verified by the intending buyer by any inquiry he might make, I think the case is not against the view of the English case of *Attwood vs. Small*, that if the representations be relied upon it might be the foundation of an action.

The Supreme Court of Michigan holds unequivocally that "when a person sells his property upon the positive statements of another of facts, and those facts turn out to be falsely asserted, he is damaged by the falsehood, and the false assertion has all the effect of actual fraud." *Stone vs. Covelt*, 29 Mich., 359.

In Connecticut, *Ives vs. Carter*, 24 Conn., 391, the Court held that " a representation of a vendor that N. had offered a certain sum for the property, and stood ready to give it, if the other party purchased, was directly calculated to affect the value of the prop- erty, and supported an action." Here there is no qualification made, and yet the purchaser might have ascertained from N. if the representation was true.

Upon a careful review of such cases as I have been able to find, I think the better doctrine is that where the false representation of a material fact, as distinguished from a mere opinion, is made to a proposed purchaser by the seller, with the intention that he shall act upon it, and he in fact does act upon it, to his injury, the contract of sale can be set aside in equity, even though the purchaser could, by diligent inquiry, have ascertained whether the representation was true or not.

Having arrived at this view of the law, I think the relief prayed for ought to be granted.

Decree accordingly.

Honolulu, March 6, 1885.

OPINION OF THE FULL COURT, BY AUSTIN, J.

The principles which govern this case have been very fully and clearly discussed by the Chancellor. After carefully examining the testimony taken before him, we see no reason to dispute the facts as found by him, and we shall only consider the effect of the new evidence given by Mr. Dole.

The counsel for defendant says : " On Mr. Wilcox's own statement at the trial at law, he cannot now recover. He swore that he did not consider the offer a *bona fide* one, and that he made it merely to get rid of Ellis ; and in this suit his evidence is that he considered Ellis a bore, and wanted to get rid of him. That is utterly inconsistent with his present claim that he made the offer because beguiled and misled by Ellis, trusting implicitly in the seller's talk made by Ellis." Even if these statements of fact be true, we do not think they warrant the counsel's conclusion.

On the first trial, other proof than that of Wilcox was given, and upon the whole proofs the jury found against Wilcox, and held him to have bought the stock. And he now swears that all he did say and do towards a purchase was said and done because he was deceived and cheated by the concealments and misrepresentations of Ellis ; and that thereby he became liable on the judgment at law. If that judgment stands, because Ellis deceived and cheated Wilcox, as alleged, then the plaintiff can recover here.

Upon the question of concealment, we wish to refer to some facts and views not mentioned below.    In his talk with Sass, on March 31st, Ellis was told that Sass and others intended to start a new iron company, and replied :    "Start anything but a new ice company.    Foster has lost $14,000 and Wilder $40,000 in ice."    Evidently Ellis considered that new ice works would be a fatal blow to the stock he was then offering for sale, and knew how disastrous competition had been in the past, even of only two companies.    Wilder swears that the demand was limited; that, with opposition, the stock was dead as an investment. Honolulu was not like a large field in a great city, where the demand was comparatively unlimited.    This was well known to Ellis.    Doubtless Wilcox knew this difference, and the fatal effect of any competition ; but he did not know, as Ellis did, what Sass had said, and that, on April 1st, Sass left for San Francisco.    On April 10th, when Wilcox bought, Sass was in San Francisco.    Wilcox could not then interview him.    Ellis knew this, and had strong reason to believe that Sass had gone to buy machinery to erect works which would destroy the stock as an investment, and render it almost worthless.    Knowing this, he said nothing.    His opportunity to know this, from the talk with Sass and his subsequent departure, was greater than Wilcox had at the time of the sale, and yet he was silent.    A newspaper article which might be false or exaggerated, was different from a personal interview with the promoter of the new enterprise. Evidently Ellis believed Sass meant to buy machinery.    On March 25th he offers stock at $85 ; he says on April 10th he snapped at an unwilling offer of $70, and the broker, Smith, declared to Wilcox it was not then worth more than about $40.

In view of the condition of the market and the scarcity of the demand for ice, and the fatal result of competition, and of Ellis' talk with Sass and knowledge of his acts, we think that Ellis, in good faith, should have told Wilcox all he knew, in order to bring himself within the doctrine laid down by Kent, as quoted by the Chancellor as follows :    "When, however, the means of information, relative to facts and circumstances affecting the value of the commodity, be equally accessible to both parties, and neither of them does or says anything tending to

43

impose upon the other, the disclosure of any superior knowledge which one party may have over the other, as to those facts and circumstances, is not necessary to the validity of the contract." 2 Kent 484.

We think also that such fatal competition as another company was supposed to bring, good faith required to be disclosed. It was not ordinary competition; it was destruction. A mortal disease of the stock was threatened and imminent.

Upon the allegation of fraudulent representations, we think the findings of the Chancellor should be sustained.

The defendant's counsel claims that the representations should be taken to be made March 25th, when actually made, and not as of April 10th, when the sale occurred. We think this is an error. If, on April 10th, Wilder did not hold at par, as on March 25th, Ellis was bound to say so. From his silence Wilcox had then a right to assume that Wilder still held the stock at par. The sale and silence were equivalent to a reassertion that Wilder so held, and that the situation remained unchanged. Wilcox bought, believing that Wilder would not then sell for less than par. If this be so, then the false representation and the concealment were as though contemporaneous, and the language of the Chancellor's opinion becomes applicable wherein he says: "The rule as to concealment, as I have expressed it, is subject to qualification, for if there be any fraudulent suggestion or representation, then the transaction becomes tainted with fraud." If Ellis, on April 10th, had said, "Wilder will not sell for less than par," it would have been an actionable concealment to have suppressed the facts which Ellis knew about Sass and the new company, and which doubtless convinced him that the shares could not be held by anybody at par, but should be held at a very low figure. If Ellis said that Wilder held at par, he must have meant to give the idea that he so held the stock because it was worth par, and not because its value was uncertain, and he would not therefore sell, to possibly "stick his friends" at any price. The statement that Wilder held at par, or would not sell at par, may have been true in the letter, but was not in the spirit. Had Wilcox known the actual facts as to Wilder's stock, this litigation would never have been begun.

"Whether the party thus misrepresenting a material fact knew it to be false, or made the assertion without knowing whether it was true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true, is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false." Story's Eq. Jur., Vol. 1, Sec. 193. *Sharp vs. Mayor*, 40 Barb. 256.

The opinion below establishes that there was no duty on Wilcox to inquire of Wilder. He had a right to rely on Ellis' statement. The evidence of Mr. Dole of what Wilder told him as to the value of the stock, does not change the situation. Probably Wilder then thought that there would be no opposition company. The question how Wilder held his stock was not talked of to Dole.

The decree must be affirmed.

*A. S. Hartwell*, for plaintiff.

*F. M. Hatch*, for defendant.

Honolulu, May 23, 1885.