Roger I. KNOX, Plaintiff,

v.

J. Leland ANDERSON, Defendant.

Civ. No. 1382.

United States District Court
D. Hawaii.

Feb. 17, 1958.

See also 21 F.R.D. 97.

Smith, Wild, Beebe & Cades, J. Russell Cades, William B. Borthwick, Honolulu, Hawaii, for plaintiff.

Robertson, Castle & Anthony, J. Garner Anthony, William F. Quinn, Honolulu, Hawaii, Tannenbaum, Steinberg & Shearer, Bertram Fields, Beverly Hills, Cal., for defendant.

McLAUGHLIN, District Judge.

Is the purchase of $150,000 of life insurance a "do-it-yourself" project?

In 1952 Roger I. Knox, 38, a professional biologist and graduate of Stanford University, lived with his wife Ellen and their three young children on the "Valley Isle" of Maui, 70 miles from metropolitan Honolulu. Maui, with its volcanic soil, is a sugar producing island of the Hawaiian group. Knox was employed on one of the sugar plantations as a field superintendent. He was in 1952 earning a salary of $8,100 a year and had an income of approximately $1,500 from investments. Like other plantation executives Knox and his family lived in a rent-free company house, had a gardener furnished him to care for its surrounding two acres, and was supplied with the use of a company automobile. His position in plantation society seemed economically secure. Knox looked forward hopefully to the day when he would be promoted to assistant manager of his plantation at a salary of $12,000 a year.

Son of a beekeeper, J. Leland Anderson, former Mormon missionary and once a Real Silk salesman, had been in the insurance business for 25 years principally in the Los Angeles area where he resides. His specialty was selling bank financed insurance. In the past eight years he had "delivered" twenty-five million dollars of insurance so financed. When his wife persuaded him to take a vacation, their visit to the Hawaiian Islands proved little solace to him. The fabled charms of Polynesia left his one great desire unaffected. He wished only to sell more insurance. While other vacationers lolled and enjoyed the sun Anderson investigated the area for contacts. He became convinced that Hawaii could use his service of bank financed insurance. To this end Anderson returned to the Islands after his vacation, and in 1952 established an office in Honolulu, which was essentially the same in organization as the one he maintained in Los Angeles. The basic ingredients were Anderson's abilities as a salesman and the bank connections of his associate, William Van de Carr, which enabled loans to be put through once Anderson had sold the program.

Bank financed insurance is not a revolutionary concept. The method prescribes a bank loan. Instead of the loan being paid to the borrower it is utilized by the bank to pay his insurance premiums as they become due. Under the present tax law the interest paid to the bank on the loan is deductible for income tax purposes, and the saving thus incurred can be used to purchase additional insurance coverage if desired. The amount of this saving depends on the tax bracket of the insured. Below the 40% bracket his savings would be negligible and below 30% non-existent. When Anderson applied to the Insurance Commis-

sioner for a license to sell bank financed insurance in Hawaii he was warned about selling procedures, especially where the client was a family man on a fixed income.

In the field Anderson had his bird dogs. The function of a bird dog to a large extent is implied by the name itself. He precedes the agent into the field, searches for information on prospects, and holds their interests at bay until the principal agent can arrive and consummate the sale. In approaching a prospect, Anderson instructed Frank Kreidler, his number one bird dog:

"* * * [K]eep them in anticipation of meeting me, explaining to them that I will be able to give them all the information they desire * *

"I would suggest that after you get them examined and the applications are obtained that the applications, with the information blanks, which I am enclosing for your use in obtaining the necessary information, be mailed to me. I will, according to common procedure, fill in the amount I think the individual should purchase, sign the application and forward it back to you to be turned in to your branch office. I realize this will take some extra time but it is most important that the application go through my hands before going into the company."

The motto was to be to get there "Firstus with the Mostus." To this end Anderson obtained the cooperation of E. E. Bodge, then a prominent member of the Honolulu business community. Bodge signed and sent a letter which he and Anderson had prepared for prospects on Maui. The one received by Knox, dated August 2, 1952, read as follows:

"I have taken the liberty of giving your name together with a few other prominent citizens of Maui to Mr. J. Leland Anderson and his associate, Mr. Frank M. Kreidler.

"Mr. Anderson, who is an Insurance and Annuity Counselor for the New York Life Insurance Company, is in the islands for a short stay and brings with him the very latest information about a bank finance plan. This plan is a little new in Hawaii but has been in vogue on the mainland for many years.

"Mr. Anderson also writes this plan for the Manufacturers Life Insurance Company for which we are the Territorial Agents. This plan is new to me and after discussing it with some of the other agents in Honolulu, I was a little skeptical about the legality of it as some of the insurance men here are not too enthusiastic about this plan. In discussing it with our outside auditor and our tax consultant, I find that the plan is entirely legal.

"One of the reasons why some of the insurance agents are not too enthusiastic about this plan is that their companies are not in a position to write this particular type of insurance on account of some rules and regulations which have been in force for many years in their companies. Another reason is that some insurance companies' policies are not acceptable to the banks.

"Mr. Anderson has written quite a few of these policies in the short stay that he has been here—among which are a number written by the Manufacturers Life Insurance Company through our firm.

"I feel sure you will be interested in this matter if you care to give Mr. Anderson or his associate, Mr. Kreidler, a few minutes of your time without any obligation whatsoever."

The first contact was made by Kreidler. He called on Knox and asked if he had read Bodge's letter. Knox said he had but was attempting to decrease the size of his insurance expenditures. Kreidler then threw out the bait, and in substance this was the conversational action and reaction:

"How would you like to get twice as much insurance coverage and pay no more than you are paying at present?"

"Who wouldn't, but how can it be done?" inquired Knox.

The answer was bank financed insurance.

Knox at this time held seven insurance policies on himself and his family with a total coverage of $36,000. When Kreidler returned to Honolulu from Maui he had Knox's preliminary applications for $50,000, $75,000 and $100,000 of additional coverage. Knox had not been asked what his tax bracket was because he confessed confusion about taxation, but the applications contained information on salary, age, and present insurance policies. Evaluating these facts, Kreidler offered the opinion to Anderson that $100,000 was too much insurance for Knox. The reply was that he, Anderson, would determine how much insurance was enough.

As part of what he called his modus operandi Anderson demanded four prerequisites of clients before he would render his service. Knox was to be medically examined to determine insurability; he would put his old insurance policies in the hands of Anderson to be analyzed for their collateral value; Ellen Knox would be present with her husband at all meetings with Anderson; and the schedule which Anderson would draw up explaining the operation of the insurance plan in Knox's case was not to be shown to any other insurance agent. When these conditions were agreed to, Anderson wrote Knox that he would come to Maui and would "personally present the program and show you exactly how it will work in your case."

Anderson arrived at the plantation house to find a warm greeting from the Knoxes. Bodge's letter had made an impression. The Knoxes knew of Bodge and looked upon him as being one of the "big" men of Hawaii. They were frankly flattered to have been singled out for this visit by a man to whom Bodge had referred as an annuity and insurance counselor of the New York Life Company. Kreidler had called Anderson the greatest man in the insurance field. Anderson was somewhat embarrassed by the build-up which had preceded him. "I may not be the greatest," he protested, then conceded with a modest laugh "but perhaps there are none greater."

To prove this latter point Anderson offered his credentials, testimonials written by Mainland clients. One such letter lauded Anderson's "new approach" to insurance coverage. A businessman had written from Idaho, "Your Bank Financing Plan represented to me the only constructive thinking in the way of Life Insurance Service that had been presented to me in many years. * * * You have rendered a genuine service to us." The Executive Vice President of a refining company stated, "In short you have created a plan and helped work the plan for me."

In matters of personal finances Knox had always found it more convenient to supply an accountant friend with income information and have his tax forms filled in for him each year. His business was growing sugar and to him an income bracket held no more interest or significance than did some of the more complex aspects of the tax law. His insurance matters likewise had been tended to by others. On a rural island community like Maui it is not considered naive if one places trust in the advice of a neighbor insurance man as to how much coverage one should carry. There seemed little reason to consider Anderson differently. True Anderson was from Los Angeles where business perhaps was more impersonal, but he came in the business fellowship of Island insurance people.

To Knox and his wife Ellen, Anderson read the details of the insurance from the $100,000 policy issued by New York Life. He then explained from the schedule he prepared for Knox (fig. 1) how the amount of the policy could be financed by the bank plan. A letter to Knox

*Overage

United States District Court
EXHIBIT No. 4
Civil Case No. 138 X
Admitted 1-29-57
District of ...

| Date | Company | Plan | Policy No | Amount | Ann Premium | Benefits | | |
|------|---------|------|-----------|--------|-------------|----------|---|---|
| 8-30-33 | New England Mut. | 25-End | 779293 WP Ellen | 1000 | 37 10 | ✓ | | |
| 6-4-38 | John Hancock | End-60 | 462974 WP Roger | 5000 | 118 00 | ✓ | | |
| 9-5-45 | Sun Life | Child's Ed. End-14 | 1740991 | 4627 20 | 327 36 | ✓ | | |
| 9-5-45 | Sun Life | " " " 16 | 1740992 | 4627 20 | 279 36 | ✓ | | |
| 9-28-47 | Sun Life | " " " 16 | 1786154 | 4627 20 | 252 84 | ✓ | | |
| 9-1-47 | Sun Life | Paid up Life | 1786156 | 1030 00 | | ✓ | | |
| 6-3-50 | New England Mut. | OL F.I. | 1637992 10 Pd | 10000 | 285 90 | | | |
| | Total - Present Policies | | | 30911 60 | | | | |
| 10-2-52 | New York Life | 10 PL | 22400740 | 100000 | 7265 00 | WP 108 | | |
| | Total Proposed Ann. Premiums | | | | | | | |
| | Prudential | 20 Pay | 1316272 4 | | | | | |
| | Amount Required During Year | | | | | | | |
| | Collateral Loan Value. | | | | | | | |
| | Accumulative Underage | | | | | | | |
| | Annual Underage | | | | | | | |
| | Gross Interest | | | | | | | |
| | Net Interest (40% tax bracket) | | | | | | | |
| | Net Annual Outlay | | | | | | | |
| | | | | | | | | |
| Cash | Values + Dividends | | | | | | | |
| | New England | | 779293 | | | | | |
| | John Hancock | | 4662974 | | | | | |
| | Sun Life | | 1740991 | | | | | |
| | Sun Life | | 1740992 | | | | | |
| | Sun Life | | 1786154 | | | | | |
| | Sun Life | Non-par | 1786156 | | | | | |
| | New England Mut. | | 1637992 | | | | | |
| | New York Life | | 22400740 | | | | | |
| | Total | | | | | | | |
| | Less 5% Bank Reserve | | | | | | | |
| | Collateral Loan Value | | | | | | | |

EXHIBIT
No. B
Plaintiff's .........
Defendant's ✓ ........
For Identification .......
In Evidence ✓ ......
Date ...........

| Age | Loan | | 1952 | 1953 | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|---|---|---|---|
| 17 | | | | 37 | 37 37 | 37 | 37 | 37 |
| 21 | | | | 118 | 118 118 | 118 | 118 | 118 |
| 29 | | | | 327 | 327 | 327 | 327 | 327 |
| 29 | | | | 279 | 279 | 279 | 279 | 279 |
| 31 (742) | | | | 253 859 | 253 | 253 | 253 | 253 |
| 31 (742) | | | Paid up | | | | | |
| 33 | | | | 286 | 286 286 | 286 | 286 | 286 |
| | | | | 1300 | 1300 | 1300 | 1300 | 1300 |
| 36 | | | 7265 | 7265 | 7265 | 7265 | 7265 | 7265 |
| | | | 7265 | 8565 | 8565 | 8565 | 8565 | 8565 |
| | | | | 7265 | 15830 | 24395 | 32960 | 41525 |
| | | | 7265 4½ | 15830 4 | 24395 | 32960 3¾ | 41525 | 50090 |
| | | | 10065 | 17404 | 25957 | 33665 | 42105 | 50810 |
| | | | * | Overage | at all times | | | |
| | | | * | " | " " | " | | |
| | | | 327 | 633 | 975 | 1236 | 1557 | 1878 |
| | | | 196 | 380 | 585 | 742 | 934 | 1125 |
| | | CV | 719 | 771 | 825 | 881 | 939 | 1000 |
| | | Div | 178 | 193 | 208 | 223 | 238 | 253 |
| | | CV | 1190 | 1295 | 1400 | 1510 | 1625 | 1740 |
| | | Div | 322 | 360 | 4.00 | 443 | 488 | 537 |
| | | CV | 2235 | 2614 | 3052 | 3423 | 3809 | 4210 |
| | | Div | 150 | 185 | 222 | 264 | 310 | 361 |
| | | CV | 1863 | 2199 | 2567 | 2878 | 3201 | 3537 |
| | | Div | 145 | 180 | 217 | 258 | 296 | 338 |
| | | CV | 1101 | 1328 | 1578 | 1864 | 2173 | 2485 |
| | | Div | 111 | 143 | 178 | 215 | 254 | 296 |
| | | CV | 244 | 292 | 343 | 395 | 450 | 491 |
| | | CV | 356 | 533 | 713 | 895 | 1080 | 1268 |
| | | Div | 91 | 126 | 175 | 227 | 283 | 343 |
| | | CV | 1900 | 8100 | 14900 | 20900 | 27400 | 34100 |
| | | Div | | | 545 | 1060 | 1775 | 2575 |
| | | | 10594 | 18919 | 27323 | 35436 | 44321 | 53484 |
| | | | 529 | 915 | 1366 | 1771 | 2216 | 2674 |
| | | | 10065 | 17404 | 25957 | 33665 | 42105 | 50810 |

See next page for continuation

Roger I. Knox

*Interest rates & dividends are not guaranteed. It is assumed that all will affect this schedule. It is agreed that this schedule will not be*

See preceding page for continuation

| 1958 | 1959 | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|---|
| Paid up | | | | | | |
| 118 | 118 | 118 | 118 | 118 | 118 | 118 |
| 327 | Paid up | | | | | |
| 279 | 279 | 279 | Paid up | | | |
| 253 | 253 | 253 | 253 | 253 | 253 | 253 |
| | | | | | | |
| 286 | 286 | 286 | 286 | 286 | 286 | 286 |
| 1263 | 936 | 936 | 657 | 657 | 657 | 657 |
| 7265 | 7265 | 7265 | 7265 | | | |
| 8528 | 8201 | 8201 | 7922 | 657 | 657 | 657 |
| 50090 | 58618 | 66819 | 75020 | 82942 | 83599 | 84256 |
| | | | | | | |
| 58618 3⅝ | 66819 | 75020 | 82942 | 83599 | 84256 | 84913 |
| | | | | | | |
| 59741 | 68621 | 77264 | 86945 | 90186 | 92868 | 95774 |
| | | | | 800 | | |
| | | | | | | |
| 2125 | 2422 | 2719 | 3006 | 3030 | 3054 | 3078 |
| | | | | | | |
| 1275 | 1453 | 1631 | 1804 | 1818 | 1832 | 1847 |
| | | | | | | |
| | 9000 | | | | 131000 134000 | |
| | 1055 /100 7 | 7190/ | 2100 1360 /1 | | 83 76 | |
| 1030 | 1060 | 1090 | 1120 | 1150 | 1180 | 1210 |
| 259 | 265 | 271 | 277 | 284 | 291 | 298 |
| 1860 | 1985 | 2115 | 2250 | 2395 | 2540 | 2690 |
| 587 | 641 | 695 | 750 | 805 | 860 | 920 |
| 4627 | 4757 | 4890 | 5024 | 5164 | 5309 | 5409 |
| 412 | 467 | 478 | 488 | 498 | 508 | 520 |
| 3886 | 4249 | 4627 | 4757 | 4890 | 5024 | 5164 |
| 379 | 426 | 472 | 482 | 492 | 502 | 512 |
| 2707 | 2990 | 3287 | 3596 | 3922 | 4247 | 4627 |
| 340 | 391 | 439 | 486 | 537 | 587 | 638 |
| 533 | 574 | 614 | 655 | 695 | 735 | 775 |
| 1457 | 1649 | 1825 | 2002 | 2180 | 2360 | 2541 |
| 408 | 478 | 553 | 634 | 720 | 812 | 910 |
| 41000 | 48000 | 55200 | 62600 | 63500 | 64400 | 65400 |
| 3400 | 4300 | 5300 | 6400 | 7700 | 8400 | 9200 |
| 62885 | 72232 | 81856 | 91521 | 94932 | 97755 | 100814 |
| 3144 | 3611 | 4092 | 4576 | 4746 | 4887 | 5040 |
| 59741 | 68621 | 77264 | 86945 | 90186 | 92868 | 95774 |

dividends have been left to accumulate & that there are no loans against policies. Any change shown, directly or indirectly, to any insurance competitors

| 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|---|
| 118 | 118 | 118 | 118 | 118 | 118 | 118 |
| Paidup | | | | | | |
| 245 | 245 | 245 | 245 | 245 | 245 | 245 |
| 363 | 363 | 363 | 363 | 363 | 363 | 363 |
| 363 | 363 | 363 | 363 | 363 | 363 | 363 |
| 84913 | 85276 | 85639 | 86002 | 86365 | 86728 | 87091 |
| 85276 3/4 | 85639 | 86002 | 86365 | 86728 | 87091 | 87454 |
| 98433 | 101104 | 103986 | 106737 | 109643 | 112530 | 115416 |
| 3091 | 3104 | 3117 | 3130 | 3144 | 3157 | 3170 |
| 1855 | 1862 | 1870 | 1878 | 1886 | 1894 | 1902 |
| | | | | | 181000 175000 88000 | |
| 1240 | 1270 | 1300 | 1330 | 1360 | 1390 | 1420 |
| 305 | 313 | 321 | 329 | 337 | 345 | 350 |
| 2845 | 3000 | 3165 | 3335 | 3510 | 3690 | 3875 |
| 985 | 1050 | 1115 | 1175 | 1235 | 1295 | 1355 |
| 5610 | 5760 | 5910 | 6060 | 6210 | 6360 | 6510 |
| 532 | 544 | 556 | 568 | 580 | 592 | 604 |
| 5309 | 5409 | 5610 | 5760 | 5910 | 6060 | 6210 |
| 523 | 534 | 545 | 556 | 567 | 578 | 589 |
| 4757 | 4890 | 5074 | 5164 | 5309 | 5409 | 5610 |
| 653 | 668 | 683 | 698 | 715 | 733 | 752 |
| 917 | 958 | 960 | 943 | 1030 | 1030 | 1030 |
| 2723 | 2905 | 3088 | 3272 | 3456 | 3640 | 3825 |
| 1014 | 1124 | 1241 | 1364 | 1494 | 1630 | 1760 |
| 66300 | 67200 | 68100 | 69000 | 69900 | 70900 | 71800 |
| 10000 | 10800 | 11900 | 12800 | 13800 | 14800 | 15800 |
| 103613 | 106425 | 109458 | 112354 | 115413 | 118452 | 121490 |
| 5180 | 5321 | 5472 | 5617 | 5770 | 5922 | 6074 |
| 98433 | 101104 | 103986 | 106737 | 109643 | 112530 | 115416 |

by Anderson written subsequently exemplifies the latter's method of presentation:

"You will note from the schedule in 1953 the only amount you will be required to pay is $1,104 in interest which is all a deductible item on your income tax report. In 1954 you will only be required to pay $205 underage and the interest of $1,613 or a net outlay in a 40% bracket of approximately $1,173. In 1955 the underage will only be about $754, the interest about $1,975 or a net outlay of approximately $1,939. In 1956 the underage will only be $538 plus the interest of about $2,440 or a net outlay in a 40% bracket of $2,002. 1957 is the last year you will be required to pay underage amount-int [sic] to approximately $24. The interest that year will be about $2,926 or a net outlay of $1,780. The interest payment is reflected in the schedule for each year thereafter and only increases until 1962 in proportion to the payments made by the bank. From then on, assuming interest rates remain constant, the yearly outlay would be the same.

"You will note from the schedule the average annual gross interest outlay would be only about $3,687 per year and an average net in a 40% bracket of $2,213 per year. The total average annual net outlay would be about $2,285. This includes the average net interest outlay and the average annual underage. I am sure you can readily see the advantages of this outstanding program.

"You will notice the total amount of insurance in force on your life including the old and new insurance is about $190,911. You were paying before for a total of $40,911 of insurance approximately $2,005 per year in premiums. The advantages of the program I am sure are obvious to you from a protection point of view.

"From the schedule you will note that the total cash value in 1973 will be approximately $184,629. At that time you would owe the bank approximately $125,000. If you had not put away any money to pay off the bank loan the net cash value after the bank was paid of [sic] would be approximately $59,689. The total cash value at age 65 if you leave the money to accumulate with the companies will be approximately $226,000. After paying the bank off at that time you would still have a net of approximately $100,000. This amount of cash would provide an annuity of approximately $600 per month for the rest of your life.

"I not only recommend that you use bank money to operate your insurance program but that you set up a reserve to amortize the bank loan at any time in the future. If you would invest at 3% compound interest over the next 27 years, or to age 65, approximately $2,900 per year you would have enough accumulation to pay the bank off in full, and you would then own all the policies outright. The total cash value of approximately $226,000 at age 65 would provide an annuity to you for life of approximately $1,356 per month. This income would be practically tax exempt. You would only pay tax on 3% of the purchase price of the annuity.

"There are four fundamental essentials to a good investment, namely, 1st, Security, 2nd, Guarantted [sic] Increase in Value, 3rd, Quick Marketability, 4th, Flexibility of Contract. This Plan embraces all four of these fundamental essentials.

"This nutcracker of inflation and high taxes in which we are all caught impels any good business or professional man to take advantage of every legal tax deduction he possibly can. You will, I am sure, agree that it does no good to take an aspirin for a tax headache. Through the application of the Bank Finance Life

Insurance Program, one is able to solve Inheritance and Estate Tax problems, create additional protection for his loved ones, provide greater cash accumulations for retirement later and at the same time create a legitimate income tax deduction. Due to inflation the dollar buys less today than it used to therefore, there is a greater need to provide additional dollars for loved ones in the event of premature death and options on larger annuities for retirement in the future."

Knox testified, "He spun me all around."

During Anderson's "presentation" Knox occasionally stopped the torrent of words to ask a question. What was the effect on the program of his not being in the 40% bracket as the schedule states? Anderson answered that the program would work just as well in the 30% bracket and besides a final schedule would be submitted in its corrected form.

Knox wanted to know whether he could afford this much insurance. Anderson's answer was in effect, "You must make the decision, Roger. But remember the New York Life people have investigated you. They not only think you are able to carry the $100,000 policy but consider you such a good risk that they have given you a better rate than did your old insurance companies. New York Life is a very reputable firm and does not give everyone such an opportunity. If you have any doubt in your mind, Roger, have an accountant or tax lawyer check my schedule. But of course we have agreed that the schedule will not be shown to any insurance competitor."

The meeting lasted for 45 minutes. Knox signed a note for $974 interest on the bank loan for the first year. In honor of Anderson's visit, housewife Ellen Knox then served her "fancy" lunch in the dining room of their plantation home.

There is considerable doubt as to whether at this point Knox knew he had bought $100,000 additional insurance. It is his testimony that, in signing the note and the other papers which followed, he believed he was preparing the preliminary matters necessary before the new insurance program could go through in its final form. Anderson had stressed the fact that the program was an integrated one. To understand its significance one would have to see the final schedule and that would be forwarded to Knox later. "The realization that I had bought this insurance just grew on me."

However long this realization took, it is established that Knox was fully aware that he was the owner of a $100,000 policy when he met Anderson for the second time. This was in May 1953 on Maui, with Ellen Knox again present. Anderson had discovered when he returned to the Mainland that Knox's old policies contained even more untapped collateral. This was an opportunity to sell more insurance. Anderson brought with him another schedule integrating a $50,000 policy on Ellen Knox into the $100,000 program on Roger. Knox did not protest that this second schedule was also based on a 40% tax bracket. There was little discussion. Knox told Anderson he was not interested in going over the schedule because he recalled the November explanations of the program as to $100,000. All he was interested in was whether or not the $50,000 extra insurance would "fit into my program." Anderson assured him that it did. Besides, Anderson stated, if for unforeseen reasons the insurance proved too great a burden, the amount could always be reduced. Knox was left with the belief that there would be no loss involved if such a reduction became necessary. One merely would switch to lower coverage and continue the insurance program, paying the resulting lower premium. Knox approving, Mrs. Knox applied for the additional $50,000 and both signed a note to temporarily cover the initial premium. Anderson promised to prepare and deliver a schedule showing precisely how the purchased $150,000 bank financed insurance program worked and could be lived with.

When this final schedule was received, it also was based on the 40% tax bracket.

In November 1953 Knox did something which brought upon him the ire of Anderson. After weeks of disturbance at home and at work caused by worry, he took his final schedule to E. P. Wick, an investment broker, for budget advice. Wick showed the schedule to a Prudential insurance agent and received in return the opinion that Knox had bought more insurance than a man in his position could carry. Knox wrote to New York Life explaining his discovered inability to afford the $150,000 program and asked for favorable terms upon which to liquidate. This was possible if the selling agent agreed. New York Life contacted Anderson, who refused to cooperate on the ground that by showing the schedule to another agent Knox had violated their agreement. Anderson wrote to Knox:

" * * * Now Roger, all the good things I told you about this Program and the benefits you and yours will derive from it are still correct and I feel you should not allow yourself to be deprived of this wonderful coverage that is now in force. * * *

"I still say you are abundantly capable of operating the entire Program. You are a young man and your estate and income will increase. Now is the time to buy insurance when the rate is favorable and while you are insurable. * * *

"I am taking the liberty of again enclosing copy of the Valentine letters—one from Mr. Valentine after the Program was completed and one from his widow after his death. He too had been contacted by a number of insurance competitors who were most jealous of our success in delivering the business. They resorted to all manner of foul tactics to try to upset these people before and after the business was placed. They even contacted Mr. Valentine's attorney and CPA and they told him he didn't need this insurance. However, the Valentines maintained their

confidence in me and the results are of course obvious. * * * "

Left with no hope of liquidating upon favorable terms, Knox cancelled the policies with New York Life.

Defendant contends that he did nothing which in any way violated the tenets of the Golden Rule, his guide in life and business. He claims no knowledge of plaintiff's income or worth. He did feel obliged to point out the pitfalls of the intricate program, but he understood that obligation to be only moral. He represents that he discharged this duty according to his standards. "I answered all their questions," he states. When he held himself out as a counselor he meant only that he was someone clients could "feel easy with" during the sale of insurance. As to the reliance his clients here claim they placed in his advice, defendant remembers nothing. His memory serves him faithfully, however, when he recalls what his clients did. They bought the insurance.

A contemporary legal philosopher has observed:

"Fraud, as defined by law, has such a supremely ugly mien because it appears in court with a smirk of at least temporary success." [1]

No one should be jeopardized for being unusually successful at his trade, but he should be held responsible for the intelligent fulfillment of the duties he has assumed by his own actions. A seller might classify himself as a salesman. Yet where this subjective classification differs greatly from representations he makes about himself in the business community, the Court will be principally concerned with the consequences of these representations.

Defendant has told the Court that he is nothing more than a salesman. Yet in the past he has stated that it had taken him years to work out the details of his bank financed insurance plan based on schedules which he boasted no one could understand. One well qualified expert testified that despite his familiarity with

1. Cahn, Edmond: The Moral Decision, Indiana University Press, 1955.

bank financed insurance it took him six or seven hours a day for two weeks to analyze the schedule prepared by defendant for plaintiff. The former Insurance Commissioner of Hawaii testified that he had to spend thirty to forty hours on the final schedule just to trace what happened to plaintiff's old policies in the new program.

To whom could plaintiff turn? Defendant had extracted an agreement that the schedules would not be shown to any other insurance agent. Ostensibly such an agreement was to prevent a competitor from moving in and selling insurance after defendant had done the preliminary work. Whatever the design, the defendant effectively blocked all avenues of information. True defendant urged plaintiff to consult an accountant or a lawyer, but this was at the stage of his sales pitch when he had gained plaintiff's confidence and calculated this move to lead to greater confidence. Furthermore, the information received through these sources would most probably be restricted to the mechanical accuracy of the schedules or the legality of the plan. These factors were never the problem. What plaintiff needed was information as to whether the intricate bank financed plan was suitable to one in his position. He needed to know whether once used as a means to afford more insurance the plan itself could be lived with over the years. The best source of this information, someone with an insurance background, was cut off by defendant.

Frequently during defendant's presentation of his insurance plan issues were avoided and vital questions ignored, evaded or met with half-truth answer or answers susceptible of more than one interpretation. Whether he be a counselor, expert or merely a salesman, the fact remains that defendant after gaining plaintiff's confidence did not explain the insurance plan so that plaintiff understood it sufficiently to make an independent decision. In effect, therefore, it was defendant who made the decisions and who thereby took upon himself the task of rendering intelligent insurance service

based on the requirements and capacity of plaintiff. Defendant has failed in his responsibilities. He has failed for the reason that after devising a complicated insurance plan tailored for a man in the 40% tax bracket he sold the plan to plaintiff, who was in the 26% tax bracket. As a result plaintiff suffered a loss. Whether defendant knew plaintiff's tax bracket or not is immaterial. He should have known. It was a pivotal consideration upon which depended the successful operation of the plan over the years.

Defendant claims plaintiff was naive or indifferent to the workings of the insurance plan sold. Perhaps he was. However, the doors of this Court are open to the gullible as well as to the alert and sophisticated. It could be said that a more reasonable man under the circumstances might have taken greater care in ascertaining the significance of the tax bracket factor in the context of the bank financed insurance. Yet it was defendant who conscientiously strove to have plaintiff rely on him in this matter. The nature of the reliance which resulted cannot be utilized to mitigate defendant's culpability. The complexity of the insurance plan sold to plaintiff brings us into an area of the law which has long since seen the demise of caveat emptor. "Buyer beware" lingers now only in the argument of the lawyers.

Plaintiff is hereby awarded his actual damages of $13,309.98. Included in this figure is the amount of overborrowing which on the eve of trial was tendered to plaintiff but which has not been paid because of the latter's refusal to accept. No credit is given to defendant for converting plaintiff's old policies to more favorable forms or for the additional insurance coverage for the time it was in effect under the new program. These expenses would not have been incurred had it not been for the fraud.

The Court further awards $2,500 for mental suffering and $10,000 as punitive damages.

Findings of fact and conclusions of law shall be submitted in accordance with local Rule 4(d).