**J. Leland ANDERSON, Appellant,**

v.

**Roger I. KNOX, Appellee.**

**No. 16196.**

United States Court of Appeals Ninth Circuit.

Dec. 4, 1961.

Ivan E. Lawrence, Reseda, Cal., and Mitchel J. Ezer, Beverly Hills, Cal., for appellant.

J. Russell Cades and William B. Borthwick, Honolulu, Hawaii, for appellee.

Smith, Wild, Beebe & Cades, Honolulu, Hawaii, of counsel.

Before CHAMBERS, POPE and HAMLIN, Circuit Judges.

POPE, Circuit Judge.

The appellee Knox, who was plaintiff below, brought this action to recover damages alleged to have been incurred by him in consequence of alleged fraud and misrepresentation on the part of Anderson, the appellant, in inducing Knox to purchase a certain life insurance contract of the New York Life Insurance Co. Anderson was the company's agent. Knox had judgment in the court below from which this appeal is taken. The trial judge's opinion in the case, which was tried without jury, is reported under the title of Knox v. Anderson, D.C., 159 F.Supp. 795. The Judge's formal findings are also reported at 162 F.Supp. 338. For the purpose of keeping the length of this present opinion within acceptable limits we shall not here undertake to set forth at length those findings but will assume that the readers of this opinion have acquainted themselves with the trial judge's opinion and findings.

The negotiations which led to the purchase of the insurance began in August, 1952. Knox, then 36 years of age, lived with his wife and three children on the Island of Maui where he was employed as a field superintendent on a sugar plantation. Anderson, a resident of Los Angeles, had been for many years an insurance representative and salesman, and in 1952 he established an office in Honolulu in association with one Kreid-

ler, also an insurance agent, with a view to selling insurance in the Hawaiian Islands. Anderson had specialized in the sale of what is referred to throughout the record as bank financed insurance or insurance under the bank loan plan. The features of this type of insurance as it was sold to Knox may be illustrated by describing the method of financing the policy which he purchased covering his own life. This was a $100,000 ten payment life policy. As the annual premiums on this policy were $7,265 and Knox's total annual cash income was only in the neighborhood of $10,000, the insurance was offered to him under this bank financed plan which involved among other things these features:

1. Knox turned over to Anderson his existing life policies with various life insurance companies. These had been issued in sundry face amounts aggregating something in excess of $35,000. In doing so he authorized Anderson to convert them in the manner which will hereafter be described, and to borrow thereon sufficient cash to pay the first premium of $7,265, and to pledge the remaining cash values of those policies as collateral for the bank loans hereafter mentioned.

2. The plan was that subsequent premiums would be provided by borrowing the amounts thereof from a bank and securing the bank by assignment of the old and new policies. It was calculated that by the time the first such loan was procured the assignable cash value for security purposes would be such that the necessary loan would not exceed 95 per cent of the assigned values.

3. Knox, the insured, would pay each year only the interest on the bank loans, but since his interest payments would be tax deductible the annual net out-of-pocket payment required to be made by Knox in order to carry the plan would be only the interest on the loan less the amount of taxes he would be able to save by deducting this interest in his income tax return. (Obviously the net cost to Knox calculated in this manner would depend in a substantial degree upon the tax bracket in which his income tax was calculated. This saving through deduction of interest paid was deemed to be the main attractive feature of the bank financed plan of paying life insurance.)

4. The purported advantages of obtaining this extra $100,000 of life insurance was that it would at once provide for Knox a large coverage at an early age when the premiums would be low and for a minimal outlay, that outlay being as above indicated merely the interest on bank loans for successive premiums reduced by his tax savings. (As against this, as we shall later have occasion to note, as each year's premium came due, the insured must increase his loan at the bank by the amount of the annual premium and in ten years he finds himself with a very substantial amount owing to the bank, and each year his interest payments increase accordingly.)

5. An aspect of this plan primarily attractive to the selling agent was the size of the agent's commission, computed on the basis of an annual premium far in excess of what would ordinarily be procurable through selling a person in Knox's financial situation the type of policy which an insurance agent might be likely to be able to sell.

For a man whose income and financial condition is such that his income tax puts him in high brackets and who has the means to liquidate the steadily increasing debt out of other sources, the bank finance plan can well be useful. Much use has been made of the plan under these conditions. Thus X paying taxes in a high income bracket, with resources which he currently wishes to use for other purposes, as for instance in the stock market, may find the bank finance plan of insurance an attractive arrangement. Such a man gets an immediate large coverage of insurance with premiums based on his early age at a time when he is sure of his own insurability.

It is clear from the record that what brought about this controversy, wholly apart from its merits, was that Knox was not that kind of man. Knox had an annual salary of $8100 per year; he had

investment income which was not in excess of $1600 per year.[1] This came from securities which he testified had a value of about $12,000. In addition, in his position as superintendent of the sugar plantation, Knox had the free use of an ample dwelling house and the free use of a company automobile. The court found that Knox's income was such that he was placed in the 26 per cent tax bracket.[2] It also found that Knox had expectations of being raised at some time in the future to be assistant manager of the sugar plantation at a salary of $12,000 per year.

The court found that Knox was induced to buy the life insurance policies above mentioned by certain representations made to him by Anderson which were false and fraudulent. These representations upon which plaintiff relied are listed at length and in some detail under paragraph 8 of the findings beginning on page 340 of 162 F.Supp.

In a subsequent paragraph 9, the court found that Anderson failed to disclose to plaintiff certain material information and facts which he knew with respect to the proposed insurance plan; that Anderson was under a duty to make disclosure because of a relationship of trust and confidence, and because of Anderson's superior knowledge; and the court concluded that liability on the part of Anderson accrued not only from the alleged false and fraudulent representations, but also from these failures to disclose.

We think that for the purpose of disposing of this appeal we need go no further than to consider the facts relating to what the court found to be the central and primary representation made by Anderson with respect to the policies purchased, namely, that Anderson represented to Knox, under circumstances permitting him to rely thereon, that the proposed plan for bank financed insurance which Knox agreed to purchase "was a suitable program for plaintiff and his family and fitted their needs."[3]

We shall note as we proceed that the trial court treated this representation as one of fact and not as a mere expression of opinion. Our discussion of that question will await our primary inquiry: did the evidence here warrant the judge in finding that there was such a representation and that the representation as made was false.

■ It is our opinion that the evidence before the trial court warranted its findings that there was such a representation of suitability and that such representation was not true in that the insurance program sold to Knox was in fact not a suitable one in view of all the facts then existing with respect to him—his income, his financial condition, his prospects, his family, and their prospective needs.

■ The question whether the representations made by Anderson to Knox were actually false or made with such recklessness as to make them substantially fraudulent, is a more difficult one; it turns in part upon a decision as to whether the representation of suitability was in truth a representation of fact and not a mere expression of opinion. In approaching these matters it is not the function of this court to find the facts initially but merely to ascertain whether the facts as found by the trial court were, in view of the record, clearly erroneous.

Our inquiry is directed to the determination as to whether a case was made here upon a claim of false and fraudulent misrepresentation of facts upon which

1. The court found $1500 per year; Knox said "$1500 or $1600."

2. It was stipulated that his actual tax bracket for the purpose of calculating deductions of interest under the bank loan plan would be 24.6%. Of course a precise bracket of 24.6% could not be found. It is assumed that the stipulation is based upon a calculation that not all of

his deductions would come off his top bracket.

3. This is an abbreviated method of referring to the alleged representation as to suitability. The representation included statements as to the reasons for its suitability, more fully developed in subdivision (a) of paragraph 8 of the findings above referred to.

Knox relied to his detriment. There is some language in the findings which suggests that the trial court might have proceeded upon the theory that there was a fiduciary relationship of some kind between Anderson and Knox. Thus the court's finding 9 (162 F.Supp. at 341), refers to the defendant's failure to disclose material information and facts "which Defendant was under a duty to disclose to Plaintiff because of the relationship of trust and confidence which existed between Plaintiff and Defendant and the superior knowledge of Defendant." Similar language is used in the first of the court's conclusions of law where it refers to a "relationship of trust and confidence which existed between Plaintiff and Defendant".

However, we find it unnecessary to inquire whether a fiduciary relationship did exist between Anderson and Knox. We assume that it did not, for it is plain that Anderson was the agent of the insurance company and as such agent he endeavored to make a sale to Knox who must have understood that he was dealing with an agent of another party.[4]

4. Appellees in supporting the judgment have placed considerable emphasis upon the case of Edward Barron Estate Company v. Woodruff Co., 163 Cal. 561, 126 P. 351, 357, 42 L.R.A.,N.S., 125. That case, referred to later in this opinion, was one in which the defendant architect was sought to be made liable in consequence of his representation that a building for which the architect drew plans and specifications could be constructed at a cost not to exceed a certain amount. The question presented was whether the architect's assertion was a statement of fact or an expression of opinion. It was held that the defendants had been guilty of a breach of duty in a failure to make disclosure of certain facts, the court saying that: "By virtue of this agency and relationship of trust and confidence it became the high duty of defendants to make full disclosure of all the knowledge which they possessed and which it was desirable or important that their principal should have." For a recent case in which an insurance agent was charged with liability for failure to give information to a property owner for whom he had acted as an insurance broker, see Hardt v. Brink, (D.C.Wash.), 192 F.Supp. 879.

But in each of those cases where liability was projected upon a failure to give information the defendant was clearly the agent of the plaintiff. We do not assume any such agency relationship here. Anderson was not a full time agent of New York Life. He had what he called a "brokerage contract" with that company.

In writing to Knox, Anderson used a letterhead in which his name was followed by the description "Insurance and Annuity Counsellor". Above his name appeared the words "Life Member Million Dollar Round Table N.A.L.U." N.A.L.U. was the abbreviation for National Association Life Underwriters, the members of which subscribed to a code of ethics which contained a preamble reciting: "The position of the life underwriter is unique in that he is the liaison between his client and his company. As a life insurance adviser he owes a high professional duty towards his client but at the same time he also occupies a position of trust and loyalty to his company. Only by observing the highest ethical balance can he avoid any conflict between these two obligations. Therefore, I believe it to be my responsibility to hold my business in high esteem and strive to maintain its prestige." Its first two precepts were stated to be as follows: "Two. To keep the needs of my clients always uppermost. Three. To respect my client's confidence and hold in trust personal information." The reference to the insurance purchaser as a client is interesting.

In Steadman v. McConnell, 149 Cal. App.2d 334, 308 P.2d 361, 365, the court upheld the action of the Insurance Commissioner in suspending the license of a life insurance agent for making false and fraudulent representations in selling bank financed life insurance. The court said: "The appellant was an experienced expert in the field; the insured a mere layman who was led to believe that the bank plan would meet certain expressed objectives. Certainly the relationship was a fiduciary one in which Mr. and Mrs. Stokes were entitled to believe appellant's material statements."

In Hawaii, as in California, life insurance agents are required to procure a license to solicit and sell such insurance (Rev.Laws of Haw.1955, § 181–365). Such license may be suspended or revoked if the licensee has "with intent to deceive, materially misrepresented the terms or effect of any insurance contract; or has engaged or is about to engage in

## Whether the Representation Was Made

At the time Knox was approached for the purpose of inducing him to buy the insurance which Anderson was undertaking to sell, Anderson was using the Honolulu agent Kreidler above mentioned. Kreidler had made advance arrangements with Knox for Anderson's visit to the latter's home, and Kreidler was present at the time the sales efforts were being made by Anderson. Kreidler testified that Anderson then expressed his opinion as to the suitability of his plan for Knox and his family. He said: "Mr. Anderson explained that it was advantageous to Roger Knox and his family, that it would benefit him at all times and that it was cheaper too, as long as he could afford it under a credit of tax deductibility, that he might as well have it and not need it than to need it and not have it, that it was an excellent plan throughout the entire period of this man's life."

The opinion of the district court sets out at length (159 F.Supp. p. 803), a letter written later by Anderson to Knox which it found "exemplifies [Anderson's] method of presentation." [5] Among other things to the same effect, the letter stated: "I am sure you can readily see the advantages of this outstanding program", and "There are four fundamental essentials to a good investment, namely, 1st, Security, 2nd, Guarantted [sic] Increase in Value, 3rd, Quick Marketability, 4th, Flexibility of Contract. This Plan embraces all four of these fundamental essentials."

In substance the testimony of the witness Kreidler as well as that of Knox and his wife was to the effect that many similar statements were made by Anderson to Knox at the time that Anderson first presented the insurance deal to him.

Anderson testified that he made no such representation as to the suitability of the program he was selling. Plainly the trial judge did not believe him. Indeed, as we note hereafter, Anderson testified that the question of the suitability of the bank loan plan for Knox and his needs did not concern him.[6]

That Anderson did in fact inform Knox that the program was a suitable one and strongly urged him to purchase the insurance as meeting his needs and consistent with his capabilities is supported by evidence which the trial court had the right to believe.

## Knox's Right To Rely

We are also of the opinion that under the circumstances of this case the court was fully warranted in finding that Knox had the right to rely upon these representations of suitability. The court's opinion and its findings reflect the view that Anderson went to considerable pains to lay the ground work for a maximum impact of his salesmanship upon Knox.

As there noted Knox first received a letter of introduction from E. E. Bodge, president of a Honolulu business corpora-

---

any fraudulent transaction" or "if in the conduct of his affairs under the license, the licensee has shown himself to be a source of injury and loss to the public." (§ 181–402). It is conceivable that one who is thus licensed is by virtue of the act made to assume duties toward his purchasers comparable to the fiduciary obligations of lawyers and physicians, and that this concept may have been the basis for the quoted statement in the California case cited.

5. We shall have occasion later to discuss the relevance and admissibility of this letter which was written after Knox had completed his purchase of the $100,000

policy and of another $50,000 policy on the life of his wife. It would appear from the trial court's opinion and findings that it regarded the writing of this letter as a part of a continuing plan, design or scheme. See Wigmore on Evidence, 2d ed., § 304, and McCormick on Evidence, p. 346.

6. In substance his story was the same as that given by him in a letter of explanation written to an officer of the New York Life: "From the schedules, photostats of which are enclosed herewith, and the explanations given to Mr. Knox, you can readily understand that he and his wife made up their own minds."

tion, describing Anderson as an insurance and annuity counsellor who was temporarily in the Islands and who had the latest information about a bank financed loan plan. Bodge indicated that at first he was skeptical about the plan but he had made inquiries and found the plan entirely legal; that some insurance companies were not enthusiastic about it because they could not write this plan. It was suggested that Knox might care to give Mr. Anderson some time for presentation of this matter. The plain inference was that Anderson had superior knowledge on the subject. Anderson had suggested the writing of the letter and examined its form before it was sent.

Anderson gave Kreidler instructions to approach his prospects keeping them in "anticipation of meeting me" and explaining that "I will be able to give them all the information they desire." [7] Kreidler testified: "I, naturally, as a part of

my work gave Mr. Anderson a big build-up as to his ability and capability and qualifications." [8]

■ The finding of the trial court (162 F.Supp. 343), that when Knox purchased this program of bank financed insurance "defendant knew that he did not understand said program and did not intend that he understand same and Plaintiff did not make an independent decision thereon but relied completely upon Defendant" cannot be said to be clearly erroneous, not merely because of the assurance which Kreidler gave Knox that he was about to meet a man who was especially qualified to give information in this field, indeed "the only one that was qualified to do this tremendous job",[9] but also because there were circumstances from which the court could infer that Knox was obliged to take the program on faith and in many important respects to act in the dark.[10]

---

7. Kreidler was to get their agreement that "my modus operandi will not be divulged to any other insurance competitor * * I would suggest that the least [sic] you tell them and the more you can keep them in anticipation of meeting me explaining to them that I will be able to give them all the information they desire if they will but cooperate in the above requirements." The quoted sentence lacks some grammatical completeness but the meaning conveyed seems to be "The less you tell them and the more you keep them in anticipation of meeting me the better it will be."

8. Kreidler testified that he represented to Knox that Anderson was a very successful insurance man, an authority on the bank financing plan and its ramifications as to tax savings and the ability to carry additional insurance. He used testimonial letters relating to Anderson to develop this idea with Knox. His procedure was to talk to any prospective purchaser about the merits of Anderson's ability to present a plan of financing life insurance through a bank, telling them, including Knox, that after certain preliminaries Anderson, who was the expert in this line of work, would present a prepared and accurate schedule outlining what the bank financing plan would accomplish for him. He testified that Anderson himself had said that he was the only one that was qualified "to do this

tremendous job of bank financing and that others that tried it failed by the grapevine."

9. Anderson, testifying, conceded that "they would have a right to believe that I had had considerable experience in selling life insurance and bank finance plan." Mrs. Knox testified: "Well my husband said that he had given him all our financial statements, everything to do with our finances; our income and our taxes, and everything, and therefore, he said, well, I don't understand this schedule but you have everything in front of you and if you advise us to take this $100,000 schedule program why, and you know we can afford it, well, let's take it. * * * We just had great confidence in him even before he came in the door. * * * I remember him saying that it took years of study to figure out this bank loan program, and the very fact that he didn't want to show it to any other salesman proved to me that he considered them too stupid to follow it up, and that it would only confuse us. From that, he was an expert as far as we were concerned."

10. This is evidence not only by what Anderson told Kreidler about his schedules being hard to understand, as noted infra, but by the numerous respects in which the various schedules furnished Knox by Anderson were deficient, incomplete, or in error. These schedules were the basis

When Anderson arrived in November, 1952, he brought with him a schedule which was received in evidence as Exhibit 4, which purported to set out the details of the proposed bank financed insurance program. It is plain from an inspection of that schedule that at the time it was used in the presentation of the plan to Knox, which was the time when he signed up for the $100,000 policy, it was impossible to tell from that schedule what was about to happen to Knox's old policies.[11] As Kreidler put it, it would not have been possible for a prospective purchaser from this schedule to tell what the actual cost of this program was in the terms of what changes had been consummated in the old program. Kreidler said that he made inquiry as to why the schedules prepared by Anderson, such as Exhibit 4, were so complicated. Anderson replied that he had "spent a good many years devising this schedule that no one could understand." Kreidler said: "Even I couldn't understand it."

In May, 1953, Knox was approached by Anderson again with a proposal that he purchase a further New York Life policy on the life of his wife Ellen for $50,000. It had become apparent at that time that there was enough value in the old policies to permit the addition of such a policy to the bank financed plan. At that time another schedule, received in evidence as Exhibit 8, covering both the Roger Knox and Ellen Knox policies, in form somewhat similar to Exhibit 4, was presented to Knox. This again had the same infirmities as Exhibit 4 in respect of what was to happen or what had happened to Knox's old policies. In fact, the evidence is clear that Knox was told that all of the facts relating to the program would have to be furnished by Anderson to him at a later time. Kreidler stated that this use of a preliminary incomplete schedule with the understanding that the purchaser would obtain a final schedule was a part of Anderson's plan of selling this type of insurance.[12]

The evidence was that at the time Knox signed up for either of these two policies he could not have ascertained the facts as to their values, their premiums, their dividends, their loan value, their interest provisions, even if he had employed a

for the sales. Their deficiencies are treated hereafter where we discuss the question whether the program sold was in fact a suitable one.

11. A glance at that exhibit, which appears on page 799 of 159 F.Supp. makes this plain.

As indicated a portion of the insurance program sold to Knox involved the changing and alteration of his existing insurance policies; this included the borrowing upon them of funds for the payment of the first premium on the new New York Life policy. Another change involved the alteration of the policies so as to accelerate the premiums and increase the cash values more rapidly. To effect this Kreidler, on the direction of Anderson, procured from Knox his signature on the necessary loan applications addressed to these companies, and when the proceeds of the loans were transmitted through checks payable to Knox, Knox's endorsement of those checks was procured; they were made payable to "J. Leland Anderson, Trustee", and Anderson proceeded to collect the proceeds and disburse them. Knox testified that he had attempted to learn from Anderson how these moneys were used and why and was then told "You must have faith and confidence, you must believe." As Kreidler testified, that was all there was to it!

12. Kreidler testified: "In general, when a man was induced to buy under the bank financing plan he had a preliminary schedule which seemingly looked attractive to him at that time. When he had signed the note for the amount of the premium with the understanding that he would obtain a final schedule, and when that final schedule was delayed months and in some cases, in quite frequent cases, 11 months to a year, any changes or any reflections on that final schedule would have put the insured in a position that he could do nothing anyhow, he had already spent his money, he had no opportunity to consult with his attorney or a certified public accountant as to what he would have actually received under the bank financing plan, and there was no possibility of getting out of the program without a substantial loss of money due to delay in presentation of the final schedule."

certified accountant. The policies were then in Los Angeles and Anderson had not accounted for the checks which had been endorsed to him; but after the close of the November, 1952, interview, and after Knox had signed up for the $100,000 policy, Anderson told Knox and his wife they would get all factual information when they received the promised final schedule.[13]

We are of the opinion that there was sufficient evidence in the record to warrant the trial judge in believing and finding that Anderson, either in person or through Kreidler, represented to Knox that here in Anderson he found the man who was not only an expert in this field but practically the only man alive who understood the plan fully and that here was a man upon whom Knox could rely for information as to what he was buying. In short, Anderson, the court found, in substance said: You can take my word for what I am now telling you; later I will give you a schedule showing just what you have bought and how it works.[14]

It is clear that in fact Knox did rely upon Anderson's statements and we think that it would be idle to argue here that Knox should have found out for himself because of some principle of caveat emptor that the program was not at all what it was represented to be. Knox testified: "I had my faith in him because he was recommended by a leading business man in the Territory. I figured he knew what he was talking about. He had all the facts in my case. I figured he was giving me something that was designed for me."

██ Mrs. Knox testified: "We just thought, well, he will know more than most insurance men because he is so na-tionally famous, we more or less thought. Living on Maui we felt very fortunate to have a man of his calibre come to our islands. * * * He quoted and used many glowing adjectives * * * when he referred to his program it was a wonderful program; he stressed this, he stressed its goodness." She said that before they met Anderson she and her husband had been trying to arrange it so as to lessen the costs of their existing insurance program: "We were paying out too much, we felt, then on the insurance. And Mr. Anderson showed us that this would be cheaper than our old program, and we would get much more insurance, which was most attractive."[15]

Some of the circumstances illustrating how Knox relied on Anderson's statements are illuminating. For instance, it appeared that during Anderson's sales talk, alluding to the schedule, Exhibit 4, Knox called attention to the fact that the schedule showed a 40% bracket, stating that he, Knox, was not in that bracket. Anderson explained that "even if you are in the 30% bracket, it would still be favorable."

Again, as the sales conversation proceeded, the Knoxes inquired about reducing or dropping the program after they started it, in case they found it burdensome. Anderson assured them they could do so. What he neglected to tell them was that they could do so only at a very substantial loss. (Finding 8(b) (3).) But it is plain that this assurance helped to lessen any concern they might otherwise have had about entering on this extensive undertaking. Again Kreidler testified that Knox, noting Exhibit 4, said that the amounts in the last 15 years on

---

13. Kreidler testified: "To the best of my knowledge as we were leaving Mr. Anderson told the Knoxes that when they saw the final schedule with all of the factual information contained therein, that they would be pleased to know that their family was protected under this very— that they would be well pleased with the protection that was afforded under this plan."

14. As a matter of fact the promised schedule introduced as Exhibit 10A was not forthcoming until September, 1953. It was accompanied by a letter addressed to Knox dated September 14, 1953 (Exhibit 10B). We shall have occasion to discuss these documents later.

15. Kreidler knew, for Knox told him so, that Knox was attempting to reduce his annual insurance outlays and his existing insurance program. Anderson is of course chargeable with this knowledge.

the schedule were more than he was currently paying in premiums; that Anderson then said: "Disregard the schedule; it will nevertheless cost you less." Kreidler continued, "He used the terminology that he would have more insurance protection for his family for less outlay of dollars."

The facts here related, and thus credited by the trial court, sufficiently establish Knox's right, as a matter of law, to rely on these representations as to suitability, if, as the court found, the representations were false, and were made with intent to deceive.[15a] Appellant argues, quoting from Kerr, Fraud & Mistake, 254: "A man who abstains from inquiry where inquiry ought to have been made cannot be heard to say so and to rely on his ignorance. * * *. In the absence of inquiry where inquiry ought to have been made, the Court is bound to assume that the person from whom inquiry should have been made would have done what it is his duty to do." Such a rule is not apposite to the fact situation present here. As Prosser has noted (Law of Torts, 2nd Ed. p. 552): "The last half-century has seen a marked change in the attitude of the courts toward the question of justifiable reliance," and quotes from Chamberlin v. Fuller, 59 Vt. 247, 256, 9 A. 832, 836, the now classic statement that "no rogue should enjoy his illgotten plunder for the simple reason that his victim is by chance a fool." And Harper & James, The Law of Torts, § 7.12 puts the rule thus: "It does not lie in the mouth of a defendant to argue that although he intended to cheat the plaintiff, by lying to him, the latter ought not to recover because he should not have trusted him," adding a footnote as follows: "Jenness v. Moses Sake Development Co., 39 Wash.2d 151, 160, 234 P.2d 865: 'Unquestionably appellants were naive and credulous, particularly in the light of their experience in the tavern business, but the rule is well settled in this jurisdiction that a wrong-doer can-

not defend his wrongful actions by calling attention to his victim's gullibility.' An early leading case is Togni v. Tamenelli, 11 Cal.App. 7, 14, 103 Pac. 899 (1909), in which Cooper, P. J. reasoned that 'No one has a right either in law or in morals to complain because another has placed too great reliance upon the truth of what he himself has stated.' (Cases cited)"

### Was The Program Suitable, As Represented?

This brings us to the next inquiry which is: does the record support the court's finding that the program sold to Knox was in fact not suitable?

Here again we must say that the court's finding on this point was not clearly erroneous. There was considerable evidence to support it. Some of it came from qualified experts in the insurance field who undertook to demonstrate through analysis of the Anderson proposals and with the aid of charts, diagrams and mathematical calculations that the program sold to Anderson was not a suitable one. While the schedules (Exhibits 4, 8 and 10A) furnished by Anderson were not self-explanatory, and required extensive mathematical calculations to disclose just what the program contemplated, yet once those calculations were made, it was not difficult for the court to draw its factual inference of unsuitability from these figures.

The expert witnesses, both those for the plaintiff and for the defendant, were in substantial agreement as to what would constitute a suitable insurance plan for Knox and his family and as to what factors would have to be considered in order to determine such suitability. We think that appellee has correctly summarized the views of these witnesses in saying that they agreed "it was necessary to know (i) the details of the existing insurance program; (ii) its values and benefits, (iii) the cost of continuing the old program, (iv) the additional cash

---

15a. As we shall note hereafter, a representation made without any belief as to its truth, or with reckless disregard whether it be true or false, is one made with intent to deceive.

outlay for the new program, (v) loss of values and benefits, if any, under the old program, and (vi) the additional values and benefits of the new program." [16]

Van Cleve, a thoroughly qualified expert in the insurance field, with 37 years of experience, demonstrated with a great degree of clarity and reference to specific details, the reasons why the Anderson program was not suitable for Knox. With the use of figures and amounts he demonstrated that the program failed to provide the protection Knox was led to think he was getting; that it in fact destroyed some protections he already had; that the program was not worth the money it would cost; that Knox could not afford it; and that he did not understand it.

A rather striking thing about the pattern of the new program was that under it Knox's insurance protection sharply decreased for the first ten years during which premiums had to be paid so that at the end of that time the amounts receivable in the event of death were hard-

16. Anderson on cross-examination, albeit with a certain degree of evasiveness, admitted that these factors would have to be taken into consideration. He testified:

"Q. Mr. Anderson, do you agree that in determining the suitability of a program of insurance such as the one that you were presenting to Mr. Knox to be financed by bank finance plan, that first you would have to know the existing program, what was provided, what it will cost to continue the program, and also the benefits of the existing program? Do you agree with that? A. I am sure those are factors. But all of these points don't mention the right of the individual to make his choice.

"Q. I will get back to that. That certainly is a necessary element in the consideration of suitability, is it not? * * * A. Yes, with qualifications. There are certain things you must also take into consideration.

"Q. I know that is just one of the elements, isn't that right, what I have recited in my question to you? A. Not one. You recited several elements.

"Q. Shall I go over it again?

"The Court: Wait. Try to stop guessing as to why he is asking these questions or anticipating his point. Just answer the question and we will get along better. * * *

"Q. * * * In determining the suitability of a program such as the one that you were presenting to the Knoxes to be financed by the bank loan plan of finance, —take one element at a time—it would be one of the elements to be considered or one of the elements to be considered is, was there an existing program? Just stop there. Isn't that right? A. Yes, I think that is true.

"Q. All right. Number 2, you would want to know what the existing program was, what it provided, what coverage it provided, is that right? A. Yes. Our schedule called for that.

"Q. You would want to know, would you not, what the cost was of the existing program? A. Yes, our schedules require that.

"Q. Just answer the question and we will get on better. We will get to the schedules afterwards. Third or fourth —whatever it is—you would also want to know the benefits that were contained in the existing program, isn't that right? A. Yes, our schedule calls for that.

"Q. Then you would want to know what additional cash outlay there would have to be for the new program and what additional benefits you would get out of the new program, isn't that right? A. Yes, the policies and the schedules call for that and show that.

"Q. Then you would next want to know what the variables and the risks of the new program were so that you could appraise whether it was suitable to answer, suitable or desirable to enter into the program, isn't that right? A. Yes. I like the term 'variable' much more as simplifying 'risks'.

"Q. That is another thing that would have to be known, what the variables of risks were. All right. You would also want to know what the loss was of benefits under the old program if there were any loss, isn't that right? A. Yes, but there were no losses.

"Q. I am not asking you about this program for the minute. I am just asking you generally. If there were any losses under the old program, you would want to know what they were? A. Oh, yes, if there were.

"Q. Next and finally, in order for it to be suitable there would have to be some reasonable understanding on the part of the man that was buying it, how the program works, isn't that right? A. Yes, I would say so. This was done also."

ly more than he would have collected had he left his insurance policies as they were under his old program. The reason for this was that Knox himself would start out with a new $100,000 New York Life Insurance policy added to his old policies, but in initiating the new policy, as previously indicated, he had to borrow substantial sums from the cash reserves of his old policies thus reducing their protection and in each year thereafter he had to borrow from a bank the annual premiums of $7265 payable each year for the ten year period. Although the plan contemplated that he would only pay the interest on that $7265, yet each year during the ten years his bank indebtedness would increase by another $7265. In like manner he had to borrow on account of the premiums on Ellen's policy $3758 each year and thus enhance the total bank loan by that additional amount.

The net result of this was that at the end of ten years he would owe the bank $125,000. If he could have died in the first two or three years, under this program his beneficiaries would reap some substantial benefits from the Anderson plan; but these benefits taper off very rapidly because all of his policies, old and new, were required to be pledged with the bank as collateral for the loan; therefore the amount collectible on death would be only the balance remaining after payment to the bank.

Thus, even Stoessel, an expert testifying for the appellant, stated that by 1961 the difference in death benefits between the old program and the new would have been only $23,000. In the meantime, although Knox under his old program was paying premiums of $671 per year, during the ten years up through 1961 he would pay out in excess of $29,000 in gross interest, and some $17,580 in net interest, even assuming he was in a 40% tax bracket, and assuming the interest rates used for calculation of the schedules. Ten years of payments of the old

premium would make a total of $6710. Based on the tax bracket and interest rates mentioned, the net interest cost of $17,580 would then be $10,870 more than the cost of the old plan which would appear, even on Stoessel's calculation, to be an excessive extra cost for $23,000 in additional death benefits.[17]

The evidence showed that this sliding downhill of the amount of the available protection was not the only decreasing aspect of the Anderson plan. By the conversions of the old insurance policies previously mentioned, the net insurance in force under those policies in 1953 was decreased $7792, "a permanent loss". The conversion also eliminated a family income rider which provided insurance in the nature of term insurance in the amount of $10,000. That family income rider would have been effective until 1965. Of course at that time the family income provision would have terminated in any event, but the effect of the adoption of the Anderson plan with its conversion of the old policies cut this family plan benefit off at once.

Van Cleve, in describing the plan, noted that the pattern of any insurance under this type of bank loan program, is a high start, going down very rapidly to approximately half of the amount of the insurance at the end of ten years. He said that that pattern does not fit in with the apparent needs of a family. In the situation of Knox, with a wife and three small children, the last child would not be through college until 1969. A suitable insurance program therefore should avoid being sharply lowered at just the time when it is needed the most.

What was needed he said was a level amount of insurance up to about 1969-70-71; after which the children might be self-supporting, and that a tapering off would be satisfactory as there would be only the wife to look after from that time on. This was one of several reasons why Van Cleve concluded that the Anderson plan was not a suitable one for Knox

17. And of course, after the first ten years his bank loan, which had reached $125,000 would require net annual interest of $2626 as long as he lived.

and his family. He compared the pattern of insurance which Knox had been carrying under his existing policies with the pattern set up in the bank plan. Referring to schedule Exhibit 4, he noted that the old policies there listed showed life insurance in the amount of $40,911. There were dividends accumulating shown on that chart: "So we have at least $42,098 of gradually increasing insurance protection in force." This was in addition to the family income policy which had 13 years yet to run. In addition some advance premiums had been paid on some Sun Life educational policies so that in the event of death there would have been some $57,000 life insurance in force in 1953.

This, according to Van Cleve, was a suitable program for the family at that time—"far better than the average man of 36 on this salary ever get to." He was of the opinion that the program might have been improved by the purchase of an additional $20 to $25,000 worth of insurance, something that would not have involved the radical change contemplated by the bank loan plan.

Another respect in which Van Cleve noted adverse and unsatisfactory results coming about through the purchase of the bank loan plan was the dissipation through the change-over of certain emergency reserves which were available under Knox's old policy. Had those policies been left alone there would have been available for Knox through his borrowing privileges substantial amounts which he might use in an emergency, such as sickness in the family or to take advantage of an opportunity to go into business, etc. Through the conversion of these old policies and changing them by borrowing, as was done to initiate the bank loan plan, this value was gone. It was gone because the approximately $14,000 which was available for such emergency purposes under the old pol-

icies had been used to pay the initial premiums on the New York Life policies which included Anderson's commission; and the remainder of that policy value was now pledged to the bank under the bank loan plan.

Another adverse result of the Anderson plan which came about through conversion of the old policies was that after the changes were made, certain educational policies which had been earmarked for the education of his children, would not be available for those purposes as planned. These were policies for $5000 each, plus dividends, one to have matured in 1959, another for the next child in 1961, and the final one in 1965, these being approximately the eighteenth birthday of each of these children. But the chart, Exhibit 10A, showed that in 1959 the collateral value of all policies pledged was $98,787, and the bank loan would then be $97,413, and since the bank would not loan beyond 95% of the collateral, the $5000 needed for the oldest child in 1959 would simply not be there. The only way the proceeds of that policy could have been obtainable in 1959 would have been to pay the bank something over $4000 at which time it might be released. Similar periods would elapse beyond the planned dates of 1961 and 1965 for receipt of the sums under the other two educational policies.

Van Cleve also testified that the usually accepted practice among good life underwriters was not to permit a policy holder to contract for more insurance than he could comfortably afford. He explained that in the event of an emergency policies often lapsed to the detriment of both the policy holder and the company; that the usually accepted safe limit for a man in his 30's, with a family to support, would be a life insurance plan calling for some 10 or 12 per cent of his income,—"Ten or twelve percent should be about the maximum you should go." [18] On the same aspect of the suita-

18. On the assumption of the correctness of the interest rates and tax bracket set forth on Exhibit 10A, the final schedule furnished by Anderson describing the plan, by 1960 Knox's bank loan would total $108,923, on which the total interest would be $3812 in that year. On the exhibit's assumption of a 40% tax brack-

bility of the plan, Van Cleve also testified that it is a standard rule among most insurance companies not to write insurance more than ten times a man's annual income; however, when Knox had ordered his $100,000 policy, that brought his insurance to approximately fifteen times his income. As Van Cleve remarked, "Frankly in reviewing this, I was surprised that $100,000 was obtainable. It would have been a difficult job to get I would think."

But the whole plan that Anderson sold to Knox included another $50,000 on the life of Ellen. Van Cleve testified that there was no sound reason for having anywhere near that much insurance on Ellen's life as she was not a wage earner. The court could well infer from this testimony that the extra $50,000 was written primarily to load Knox with insurance totaling nineteen times his annual income.

The various charts furnished by Anderson to Knox recited in their caption: "Interest rates and dividends are not guaranteed." It is apparent, however, that if the calculations made on those charts are based upon unrealistic assumptions of interest rates and tax brackets, that fact alone has an important bearing upon the suitability of the program and whether Knox was entered upon a safe or a hazardous undertaking.

None of the schedules stated the interest rates used in the calculations but Van Cleve was able to calculate them from the figures shown. Exhibit 10A started with 4.25 percent in 1953, reduced to 4% in 1954, to 3.75% in 1956, and to 3.5% in 1960, continuing at that rate until 1973. As counsel for Knox pointed out, in judging as to the suitability of the proposed program, fair allowance must be made for contingencies. Van Cleve testified that any one selling this program should take into consideration certain contingencies and variables which would alter its usefulness in important particulars. One variable was the tax bracket which for Knox might remain at about 25%. Another variable was the interest. Van Cleve said that the interest rate instead of going down to 3.5% might well go to 5%, which would be the probable rate at which a loan would be made by the insurance companies themselves.[19]

If the necessary outlay which Knox would have to make to carry this new program were based on an interest rate of 5% (which later experience showed would have been the case) and upon the stipulated tax bracket of 24.6%, then Knox's gross interest for 1960 would have been $5446.15, and his net interest $4106.40, 40% of his gross annual income. This would be a preposterous burden for a man in Knox's situation. Obviously the court could properly hold that a program which involved such contingencies, so possible and so real, was not suitable for a man of Knox's earning capacity.

In this same connection Van Cleve testified that the bank financed insurance plan could not be justified for any person whose taxes were under the 50% bracket. As previously stated, Knox's gross income was far below the $24,000, which it was stipulated would be the lowest gross income which would provide a tax as high as 40%. With his actual income tax bracket at the stipulated 24.6%, we have to note here a further reason

---

et, his net interest would be $2287, or approximately 23% of his gross income, —double the acceptable limits testified to by Van Cleve and by 1962 this net interest would be $2618, or 26% of his income.

19. Van Cleve was testifying in February, 1957. He said that the current rate for such a loan as of December preceding would be 4¾% to 5%, "with many banks that formerly took such loans canceling them even if you offered them 5%." He explained the difficulty in obtaining a sure supply of money such as here contemplated from banks because of fluctuations in the demands which the banks received. On the basis of many years experience with bank loans on collateral in the form of insurance policies, Van Cleve explained that frequently the bank loans were unavailable.

why this bank financed insurance program was unsuitable for Knox.[20]

■ Another portion of Van Cleve's testimony dealt with the problem of suitability of the Anderson program as an investment or for retirement. He said that the plan sold to Knox was an unsuitable one because it provided neither desirable investment savings nor retirement benefits. The evidence justified the court's belief that the new program was represented as one which would provide desirable retirement benefits. According to the witness Kreidler, Anderson undertook to sell Knox's program on the basis of it providing retirement funds when he reached age 65.[21] The record does not show how much in the way of retirement benefits Anderson and Kreidler represented the plan would produce. Mrs. Knox testified that when the other policy was sold in May, 1953, Anderson said the retirement benefits would be "around" $600 per month. The inference is plain that the plan was sold as suitable and valuable for that purpose.[22]

Van Cleve's testimony was that at age 65, the total values of the policies would be less than those stated in Anderson's letter; that the net, after deducting the total bank loan of $125,040 would actually be $92,576. But beyond this, the schedules and Anderson's letter failed to disclose that on surrendering of a policy the difference between the surrender value of the policy and its actual cost (which would not include the interest paid on moneys borrowed to pay the premiums) would be taxable.[23]

20. Appellant tries to justify his use of the 40% braket assumption on the ground that it was taken to be an "average" braket for Knox, over a period of years. There is nothing in the record to show that Knox could count on ever attaining a $24,000 income, much less that his income would ever average that much.

21. Kreidler's testimony was as follows: "Mr. Anderson told Mr. Knox that he would have a substantial increase of insurance protection at a reduction of dollar cost to Mr. Knox, and that at all times throughout this entire program he would have additional insurance, he would have accumulating gross cash values and dividends, and he would be later able to have retirement funds that would be available when he was ready to retire at age 65. And he would also have educational funds that would be available for his children when they were ready to go to college, if he lived or if he died."

22. In his letter of September 14, 1953, which accompanied the schedule Exhibit 10A, Anderson said: "The total cash value at age 65, if you leave the money to accumulate with the companies, will be approximately $226,000. After paying the bank off at that time you would still have a net of approximately $100,000. This amount of cash would provide an annuity of approximately $600 per month for the rest of your life." Appellant contends that this letter was inadmissible and irrelevant since it was sent after both policies had been bought. But as suggested in footnote 5, supra, both Wigmore and McCormick would agree that it was admissible both (1) to evidence Anderson's intent, and (2) to evidence the fact that this representation was made, this latter use being dependent on the existence of a design or plan to misrepresent. Wigmore (Evidence 2nd ed.), discusses the first use in § 302 and the second in § 304. McCormick (On Evidence) discusses both phases in § 164. Plainly the evidence generally was sufficient to warrant the court's treatment of this letter as part of a continuing design or scheme. As to admissibility of subsequent statements, see Wigmore § 316.

23. See 1954 Internal Revenue Code § 72 (e), 26 U.S.C.A. § 72(e), 1939 Code § 22(b) (2) (A), 26 U.S.C.A. § 22(b) (2) (A).

Van Cleve calculated the cost of all of the policies which Knox might have under the Anderson program and on which it was stated that he might withdraw cash at age 65. This cost was calculated at $134,109. Deducting this from the actual value of $217,615 would disclose the taxable profit. Van Cleve's estimate of the amount of such taxes may have been too high as he assumed the entire amount of cash value in the policies would be withdrawn rather than leaving the net amount, after payment of the bank loan and withdrawal of enough cash to pay the tax, with the company under the annuity option. The exact amount of such taxes is not material. The witness Stoessel, Anderson's expert, estimated the tax, under that state of facts, would be $30,000.

But whether the tax would be $41,753, as Van Cleve figured, or $30,000, as Stoessel estimated, it would be a very substantial amount. Instead of having a sum for annuity such as that stated in Anderson's letter, the amount would have been barely sufficient, according to Van Cleve, to purchase an annuity of approximately $300 per month. According to Stoessel, it would buy no more than $300 to $400 per month. In selling his program, based primarily on a certain tax advantage, Anderson ignored and failed to mention the tax disadvantages of that same program.

On the question of whether the program was worth the money it would cost him, the court undoubtedly credited the testimony of the witness Black.[24] Black made mathematical calculations based on the figures shown on Anderson's charts and summarized his conclusions for visual purposes on large charts which were introduced in evidence. The figures thus developed by this expert were arrived at after a long period of study and mathematical analysis of the program. No useful purpose would be served by an extensive summary of the conclusions arrived at mathematically by Black, but they do establish beyond any possible doubt the fact that a mere examination of Anderson's charts would not enable any ordinary unskilled purchaser to tell just what he was buying and just what it was costing him.

Under the new program Knox would have an *additional* cash outlay which by 1971 would amount to $30,791. This was on the assumption that the interest rates and the tax bracket used in the Anderson schedules were correct. If these outlays were calculated on the basis of an interest rate of 5% and a tax bracket of 25%, the accumulated additional cash outlay by 1971 would total $58,551. We have noted that those were realistic contingencies.

Black went on to say what this additional cash outlay would secure in the way of additional death benefits under the new program including a surrender value of the Ellen Knox program and other cash benefits. This would have procured additional death benefits of $64,182 in 1953. But if Knox did not manage to die about that time, these additional death benefits, as we have previously noted, would diminish rapidly;—according to Black they would reach $13,371 in 1961, and then gradually increase until 1971 when they would reach $25,129.

Black testified that the Anderson program for a man of Knox's age and earnings would be excessively costly for that amount of protection.[25]

Anderson's witness Stoessel [26] was propounded a hypothetical question conclud-

24. Black testified as an expert insurance man, a graduate of the Harvard Business school with extensive experience as a public accountant; as an insurance company manager with experience in estate planning for Hawaiian Trust; an insurance salesman, and as a deputy insurance commissioner where he was chief administrative officer of the insurance laws of the Territory.

25. He was asked to assume that by 1961 Knox's income was $24,000 from that time on, and that he was in a 40% bracket, and to give his answer upon those assumptions (which of course the trial court was not obliged to make). His testimony was as follows: "Q. Assuming that his income were in excess of $24,000 from 1961 on, and that he was in a 40 per cent bracket, would a program that required the cash outlay, additional cash outlay indicated on Line 2 of Exhibit 56–

B, that provided the amount of additional death benefits shown by line 1 on the same exhibit, be a suitable program? The Witness: Well it is my opinion that very few men would buy it. I would not recommend that type of coverage, because you are trading dollars, you are putting out almost the same number of dollars each year as you are getting insurance, that is, increase as you are getting protection. It is costly."

26. Walter J. Stoessel was an associate general agent for National Life Insurance Company. He was a man with some 36 years of experience in the insurance business who had had some experience in the financing of insurance with the bank loan plan. In this he had been associated with Anderson in the past and he had turned over portions of his business to his son who was currently associated with Anderson.

ing with the query whether the plan of insurance would provide a program suitable for the Knoxes. He answered: "Yes I think it is a suitable program". In this answer of course he was directly at odds with the testimony of the plaintiff's experts.

An examination of the entire testimony of Stoessel, both on direct and on cross examination, serves to reveal some reasons why the trial court rejected the Stoessel view. The first difference between Stoessel's direct examination and that of Van Cleve's is that Van Cleve not only expressed his general opinion as to unsuitability of the program but he implemented his answer with illustrations based on the schedules showing specific reasons why it could not be considered suitable for a man in Knox's position. These we have previously enumerated in describing Van Cleve's testimony. Stoessel simply expressed a general opinion as to suitability but he did not meet head-on the various points of difficulty which had been brought into the opinion by Van Cleve's testimony.

In one particular Stoessel mentioned what he said was an item of benefit in the proposed program, namely the waiver of premium contemplated in the New York Life policies. He thought that in the event of Knox's total disability, having his policy remain in effect without further payment of premiums, would furnish Knox a substantial benefit. The main trouble with Stoessel's opinion on this point is that he failed to explain what Knox would use for money to keep up his interest on the bank loan if he became totally disabled.

On cross-examination it became apparent that Stoessel's expressed opinion of suitability was not firmly founded.[27] He admitted that the bank loan plan was one attractive to "individuals in high income tax brackets". When he was asked what he meant by that he said: "40 per cent

would permit a man to carry some type of bank financed insurance". He admitted this would be about the minimum tax bracket to make the plan work, "pretty near the absolute bottom line", although there might be some exception made for "the young man on his way up."

The Judge could well conclude that Stoessel's answer of suitability could not be applied to Knox for obviously Knox was nowhere near Stoessel's minimum 40% bracket, and there was nothing to show that he had any prospects of reaching such a stage of income.

Stoessel agreed with Van Cleve that if Knox chose to retire at age 65 and drew down sufficient of the cash surrender values to pay the bank loan, a very substantial tax on the gain would have to be paid. Also on cross-examination he was called upon to calculate the outlays for insurance which Knox would have to make had he kept his old policies as compared to his out-of-pocket expense to carry the new program. The inquiry made of him was what Knox would get in the way of added protection and increased cash values for the additional outlay. When Stoessel got down to figuring that he came out with conclusions not substantially different from those made by Van Cleve and Black, all of which tended to show that he was not getting his money's worth for the increased outlay, just as we have previously noted.

Stoessel admitted that at the initiation of the new program much of Knox's old cash values were gone and that it would take some 13 years of payments before cash values under the new program would reach what they had been at the time the new program was started. He conceded that the Anderson program was such that the protection provided by the new policies would reach a low point in 1961; and his cross-examination served to demonstrate that the increasing benefits thereafter hardly exceeded the outlay

---

27. Stoessel identified as a part of his own prior published opinion with respect to the bank loan plan the following: "I am opposed to solicitation of his business when it does not fit the client's situation or objectives. I agree that its application is limited. I also agree that agents should be made aware of and held responsible for their ethical conduct."

that Knox would have to make annually to carry on the program.

It is manifest to us that the trial court was fully justified in rejecting and disregarding Stoessel's general opinion of suitability.

In a reply brief counsel for Anderson made a strenuous effort to demonstrate with a series of schedules in an appendix that the Anderson program was suitable for Knox and well adaptable to his needs. All that need be said about these is that they are completely unconvincing.

The first contention is that the plan was within Knox's financial means and ability to carry because he could meet the required outlays "almost entirely from his investment (i e. non-salary) income." Since the evidence showed that the aggregate of Knox's salary and non-salary income was less than $10,000 a year, (there is no reliable proof as to how or when this would have been increased), Knox was definitely a man of modest income and of far too modest an income to permit him to afford this wealthy man's style of insurance financing.[28]

Next it is attempted to say that this was an especially fine program because the greatest protection was in the early years. Of course, that is true, as we have noted; but the trouble is that the protection slides downhill so rapidly that as Van Cleve noted, the protection reaches its minimum in 1961, just at the time when daughter Marilyn would be 19, son Stephen, 17, and son Roger, Jr., 12. At that time, and the few years immediately preceding and following 1961, Knox would have his heaviest family responsibilities, and it would be the worst possible time for him to die with low protection. To argue that a plan of that kind "is especially well suited to Knox's needs", completely lacks persuasive power with us.

Appellant next undertakes to argue that the 40% tax bracket "was not a misrepresentation but a 20-year projected average reasonably reflecting Knox's expected income pattern." There is not the remotest basis in the record for a finding that Knox would have reached a 40% tax bracket, much less that his bracket would average such.

In another schedule it is attempted to demonstrate that the plan contained a mechanism enabling Knox to support it even if he remained in a 30% bracket throughout his life. The basis for this claimed demonstration is a scheme whereby Knox would borrow from the bank not merely the amount of the annual premiums called for but also sums necessary to permit him to pay the interest on the bank loan. Conceding that this system is "not recommended" and "not advisable", appellant says nevertheless that this could be done.[29] Obviously with all these extra borrowings an indebtedness of approximately $125,000 would be increased according to appellant's illustration by $8850 by 1971, and we would assume that if he continued thus for another ten years the indebtedness would have increased by approximately $17,000. How this situation could be said to be helpful or useful to Knox we cannot per-

28. We cannot see what difference it would make whether the amounts that Knox had to pay to carry on the plan were paid out of January and February salaries or his November and December salaries, or out of his non-salary income. The short of the matter is that he could not afford it, and as Stoessel stated, an amount would have to be above or beyond the 40% income tax bracket to make the plan work, "as this was pretty near the absolute bottom line".

29. Under this claimed scheme, assuming a 30% bracket, Knox would, according to the appellant's calculation, have a net interest outlay in 1963 of $3062; appellant would borrow $950 so that his actual cash outlay in that year would be only $2112. Just how this could be paid solely out of a $1500 investment income is not explained. The calculation is based upon the 3½% interest which we have noted is wholly unrealistic; and it does not take into account what the officers of the bank would say to a borrower who makes it his program to pay the interest owing to the bank by borrowing the same interest from the bank. Just when the bank would get tired of such a customer is not explained.

ceive; all we can say is that we agree with appellant that this system is "not recommended."

In another schedule which appellant says "utterly decimates" Van Cleve's testimony with respect to retirement benefits under the Knox plan, appellant attempts to show how Knox could get an annuity of $524 a month when he reached age 65 by handling his insurance policies in such a manner that no taxable gain would develop.[30]  Assuming all this we wonder how appellant can contemplate the projected situation of Knox at that time and still assert that this proved the plan a suitable one.[31]

It is unnecessary to comment upon some of the other schedules in counsel's appendix. It is sufficient that an examination of them confirms us in our view that the Judge was fully warranted in his findings and conclusions as we have here previously expressed.

## The Question Of Fraud

This brings us to the consideration of two questions which we think must be answered together. The first question is: was the representation made by Anderson as to the suitability of this program a representation of fact and not a mere expression of opinion? The second question is: assuming that we find here a statement or representation of fact, was it made falsely and fraudulently with intent to deceive, or was the representation made with reckless disregard whether it was true or false?[32]

With respect to the first question, dealing with the opinion problem, we think

---

30. The schedule on this plan develops the program as follows (we use the appellant's figures just as given): Appellant assumes that on all the policies by 1981 there will be accumulated values of $220,219; that by this time the total loan for premiums would be $132,803. Figuring a loan limit of 95% of the total value of collateral, $139,793 worth of collateral must be left with the bank; this would permit the balance or $81,126 free for withdrawal. At that time the $100,000 New York policy would have a cash value of $80,800, so appellant suggests that this policy could be withdrawn from the collateral with the bank and the policy then exchanged for an annuity. This exchange for an annuity under the policy option would not be taxable under Revenue Code § 1035(a) (1), 26 U.S.C.A. § 1035(a) (1) and would produce an annuity, according to appellant, of $524 per month. But the other feature of this program, in the words of appellant, was "that Knox would leave all other policies with the bank to secure the loan until Knox's death at which time the proceeds are realizable without tax consequences."

31. At that time Knox would be a retired man with an annuity of $524 per month and $1500 per year from invested income or a total of $7788 per year. His loan at the bank would be, according to appellant's assumption, $132,803 on which, at the realistic interest rate of 5%, the annual interest would be $6640.15. His income tax would be computed upon the $1500 of investment income which presumably he would still have and upon the taxable proportion of his annuity income. Without computing precisely what this would be, whether figured under the 3% rule of the 1939 Code or under the provisions of the 1954 Code, $2400 would be a fair estimate, we think. This would make a total taxable income of $3900. Assuming that Knox and his wife, then being past 65, made a joint tax return and where entitled to four exemptions, their tax would be about $227; this would then be the maximum amount of tax saving through taking credit for interest paid. This amount deducted from the $6640.15 interest on the bank loan, would give them a net annual interest charge of $6413.15. We then have this elderly couple during their declining years harnessed with the payment of $6413 a year from a total income of $7780, leaving them for their living expenses $1375 a year or $114.16 a month. What counsel for appellant have omitted from this schedule is a demonstration of how far this sum of $114.16 would go toward paying the rent and the grocery bill.

32. Hong Kim v. Hapai, 12 Haw. 185, 188, (1889): "But in such case, it would be necessary to show not only that the representations were made and that they were false, which are perhaps sufficiently shown by the complaint, but also that they were made by the defendant with knowledge that they were false, (or without knowledge whether they were true or false) and in contemplation of the plaintiff's relying upon them and also that the plaintiff did rely upon them, which facts are not shown by the complaint."

that a fair statement of the applicable rule is to be found in the case of Ed. Barron Estate Co. v. Woodruff Co., supra, 163 Cal. 561, 126 P. 351, p. 356. There the court said: "It is, of course, generally speaking, true that an action for deceit cannot be founded upon the mere expression of an opinion. But the qualifications and modifications of this general rule are as important as the rule itself. Those qualifications and modifications are numerous. It is unnecessary to attempt to illustrate them all. But, bearing in mind that an expression of an opinion, if honestly made, is an expression of what the speaker believes to be a fact, it becomes apparent that, by the expression of a dishonest opinion to one entitled to rely upon it, deceit is practiced, injury may be worked, and an action will lie. Thus the opinion of an expert employed to report upon a mine would be but the expression of his judgment, and if honestly, though mistakenly, made, of course, no injury cognizable in law, equity, or good morals could result. But instantly that the expert expresses a dishonest opinion, though it still be but an opinion, he has made himself liable in an action for deceit."

This is a rule generally recognized. It has been restated in the Restatement of the Law of Torts, § 542(a),[33] and has received general approval from the text writers.[34]

The question which the trial court had to consider was whether Anderson's statement of opinion was an honest one. If therefore when Anderson spoke he knew or believed his statement to be false or unwarranted, he would be liable, for obviously he expected that Knox would rely upon his statements. In like manner, if he gave this assurance of suitability when he knew that he had no basis for such an assertion, he would be liable for this would be a case of a representation with reckless disregard whether it was true or false.

The trial court found, as noted: "That this representation of suitability was known or ought to have been known to defendant to be false and fraudulent and was made by defendant to plaintiff with intent that he rely upon it in buying said integrated program." [162 F.Supp. 340.] Our inquiry is therefore whether that finding is supported by evidence or whether it is clearly erroneous.

In his brief here the appellee takes pains to state that he is not attacking the bank plan as such; that that plan is not on trial; and he concedes that under some circumstances this type of plan may be satisfactorily useful and suitable.

That it has usefulness in some cases we noted at the outset of this opinion. However, it is apparent that a mere look at the characteristic features of the plan is sufficient to make it apparent to any one, and particularly to the trial judge, that it contains within it features which make it inherently a system readily adaptable to sharp practices. In short, any insurance agent using this system and familiar with it must be aware of the fact that in employing it he must resist any temptation to overreach a purchaser. The court could well find that Anderson must have known that an indiscriminate use of the bank loan plan was fraught with hazards.[35]

---

33. "§ 542. Opinion of Antagonistic Party. The recipient in a business transaction of a fraudulent misrepresentation of the maker's opinion upon facts known to the recipient is not justified in relying thereon in a transaction with the maker unless the opinion is material and the maker (a) holds himself out as having special knowledge of the matter which the recipient does not have, * * *." See the comment (b) under this section.

34. Harper & James, The Law of Torts, § 7.8: "The general rule is that such statements are not actionable, but it should be noted that the rule applies unqualifiedly only when the statement of opinion stands alone and where the parties are dealing at arm's length, on an approximately equal footing as to experience, knowledge and accessibility of the facts."

35. Note the quotation from Stoessel's writing, supra, (note 27).

The first weakness of the plan in this respect in its built-in temptation arising out of the inflated commissions.[36] The trial judge could justly raise his eyebrows in observing the temptation to overselling involved in what he could properly consider to be excessively large commissions.

The second dubious feature of this plan is illustrated by Anderson's inducing Knox to let him have his old policies and to change and convert them by shortening the period for payment, borrowing to produce funds for the bank loan plan, and pledging the policies as collateral under that plan. It is in the course of this process that Knox lost the benefit of the family income rider and found his accumulated cash values gone.[37] When a bank loan plan is sold under circumstances involving the changing and conversion of the purchaser's old policies, the seller, as Anderson must have known, was skirting on the ragged edge of "twisting".[38]

A third inherently dubious aspect of the bank loan plan of insurance is that it resembles term insurance in its feature of rapidly diminishing protection. As the charts introduced in evidence, particularly Chart B, made up by the witness Black from the schedules furnished by Anderson, indicated, the protection available under the plan takes a strikingly deep nosedive during the first ten years of the program. A person who dies shortly after purchasing an insurance policy usually profits from term insurance; but its disadvantages are obvious when it is sold under that title. A salesman must know that this aspect of the bank loan plan is not readily observable to a purchaser who is not himself an insurance analyst. This difficulty of understanding extends to the whole plan.[39]

Finally, it should be apparent to any one that the purchase of a comprehensive plan of this kind, such as the one sold to Knox, is fraught with a number of chances and uncertainties, particularly for a person whose income is largely dependent upon his earnings. We have noted heretofore that while the charts furnished by Anderson did not disclose the assumed rate of interest obtainable for the loans contemplated, Anderson had assumed that for the greater portion of the program money would be obtainable at $3\frac{1}{2}\%$ per annum. The court

36. The record shows that Anderson's commissions were 40% of the initial premium and 14% of certain subsequent premiums. Had Anderson been selling Knox the traditional type of insurance for premiums that Van Cleve testified Knox might reasonably pay, for example, an annual premium of $1000, Anderson's initial commission would have been $400. Under the plan as sold, as indicated on schedule Exhibit 10A, Knox's net annual outlay would reach $2618 in 1962 after gradually increasing to that point. If a traditional type policy had been sold by Anderson, even with an initial premium of $2618, Anderson's commission would have been $1047. But when Anderson sold Knox those two policies with annual premiums of $7205 and $3758, his commission was $4409, an amount altogether disproportionate to what might fairly be said to be Knox's ability to pay. And it is to be noted that the funds to pay that came out of the accumulated values in Knox's old policies on which he had already been charged a commission which would be added to the loading in the policies.

37. It is plain from the record that Knox was not really familiar with the value of his existing policies and as we shall note hereafter the court was justified in believing that Anderson in the course of his selling misrepresented the cost and the values of those policies and what was happening to them.

38. Cf. Cal.Ins.Code, § 781, which contains the following paragraph: "A person shall not make any representation or comparison of insurers or policies to an insured which is misleading, for the purpose of inducing or tending to induce him to lapse, forfeit, change or surrender his insurance, whether on a temporary or permanent plan."

39. Upon cross-examination Stoessel admitted the correctness of his own previously published statement that "a qualified underwriter presenting the plan will make certain that the purchaser at least understands to begin with what the general scope and coverage is under the new plan as well as under the old insurance."

could well believe that this was a gamble which Knox should not have been asked to undertake. Actually, as we have noted, bank interest rates during the period for which Anderson was making these calculations ran nearer to 5%. Of course Anderson could not foresee what the future would produce but he would know that he was unable to have that foresight and that Knox could not tell either.

Other uncertainties inherent herein we have previously discussed in outlining the testimony of expert witnesses. On the possibility that Knox's tax bracket may not at any time exceed 25%, Van Cleve's testimony showed that the application of these variables or uncertainties could operate to change the chart's as-

40. Van Cleve was of the opinion that there was another variable or contingency, namely, that the Congress sometime after 10 years might amend the revenue code to deny the deductibility of such interest. That such legislation is not an impossibility is suggested by the fact that in 1954 Congress adopted § 264 of the 1954 Revenue Code, 26 U.S.C.A. § 264 which section is referred to in Knetsch v. United States, 9 Cir., 272 F.2d 200, affirmed, Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128. § 264 referred to transactions where all premiums are paid within a period of four years. Although the section was made applicable only to contracts purchased on or after March 1, 1954, the decision in the Knetsch case denying the deduction of interest was related to a transaction which preceded that date. It is also possible that the Commissioner might attempt to extend the rationale of Knetsch to a taxpayer in the position of Knox.

41. The circular contained the text of a speech on the same subject made by the same man who made the speech in Florida. Exhibit 27 shows that the author was warning against the indiscriminate use of the bank loan purchase plan because of the danger that in its use "we may be forgetting the high standards of our business." He commented upon the "self interest of the agent to earn a commission", and concluded that "when it is used indiscriminately overselling, misunderstanding and controversies do occur." The portions of Exhibit 27 here referred to read as follows:

"There is evidence in another area of our field operations that we may be forgetting the high standards of our busi-

sumed $9250 profit into a $12,021 loss. (Of course for a person on salary there is always the hazard of loss of job or reduction in pay.) [40]

Anderson knew all these things. He admitted that in March, 1953, at a meeting in Florida, he had heard a discussion of the bank loan purchase plan in a speech made by a vice-president of New York Life. This was prior to the time he completed the sale of Ellen's policy. He testified that the points made in that speech were substantially the same as those contained in a circular issued by the New York Life Insurance Co. under date of February 19, 1953, which was introduced in evidence in the court below as Exhibit 27.[41] The speaker noted the many as-

ness. I refer to the so-called 'Bank Loan Purchase Plan' used to finance the purchase of life insurance. Today millions of new business, placed with several highly respectable companies, is being financed by that method.

"The sale and purchase motives in these cases are, I believe, primarily motives of self-interest—self-interest of the agent to earn a commission and self-interest of the purchaser to gain something for nothing. I do not quarrel with the desire to earn a commission nor the desire for financial gain at little cost. But these desires should not be the primary motives in the marketing of life insurance.

"Insurance buyers have the right to finance the purchase by any legal method available. I do not intend to say—or imply—that the Plan is illegal in any way. There may be an occasional instance when its use is justifiable and will result in legitimate tax savings. But when it is used indiscriminately over-selling, misunderstanding and controversies do occur.

"This is a complex selling process requiring many assumptions to prepare and present an elaborate set of figures which illustrates or projects expected results over a period of years in the future.

"The first basic assumption—an uncertainty—is that the prospect is a standard risk. If he is substandard, the premium and cash values for the policy issued will not be those stated in the first figures submitted and the other figures in it will change correspondingly.

"Many other assumptions are needed to complete the projection picture. It is assumed that over a long period of years

sumptions that have to be made in presenting such a plan and the uncertainties attending those assumptions, concluding, "All these things are highly speculative". Anderson's own correspondence furnishes strong evidence that he was aware of the impropriety of selling this plan indiscriminately to persons of limited income. Some of his letters in the exhibits are written on stationery carrying on the reverse side a reprint from "The National Underwriter" for August 8, 1947, headed "Bank Loans to Buy Policies Again Popular with Wealthy." The article begins: "High income tax rates, low bank loan rates and the high reserves under Guertin-law contracts have combined to provide a big market *among wealthy men* for limited payment policies". (Emphasis ours)

Thus the trial court would be warranted in finding that Anderson knew when he sold Knox his program the dangers probable in case of an indiscriminate use of the bank loan plan.[42]

---

dividends will be apportioned under scales equal to the current scale; that the practice of discounting premiums at a specified discount rate will be continued; that the basis for settlement of prepaid premiums will not be changed; and that the practice of undertaking to refund advance premium payments before the insured's death will be continued. All these things are uncertain.

"With respect to the proposed bank loan it is assumed that the required margin over policy and prepaid premium values will not be increased; that the bank's interest rate will not be increased; that the bank will finance all premium payments; and that the bank will carry the loan indefinitely. All these things are highly speculative.

"The very core of the Plan's appeal is the hoped for tax savings. It is assumed that the tax law will not be changed; that the interest deduction will be allowed for income tax purposes throughout a long period of years; and —a very optimistic assumption that the prospect's top income tax bracket will continue for a similar period to be about fifty percent or higher.

"Personal fortunes change and under any tax law, tax consequences can be stated as of the present only. Such tax advantages as the law now gives can be wiped out overnight. When a method of avoiding taxes appears and is widely used, the loophole is usually closed. A few years back bank loans were used to buy single premium endowments with the sole object of taking the loan interest deduction for income tax purposes. It was a similar tax avoidance method. That loophole was closed.

"A mere recital of the many uncertainties assumed to be true for the purpose of illustrating and selling this plan indicates the many possibilities of error and misunderstanding and the many possibilities that the policyholder's expectations may never be realized."

42. These inherent hazards of the plan were subsequently discussed at length in a regulation issued by the Insurance Department of the State of New York directed to all life insurers authorized to do business in the State of New York. That regulation, No. 39, referring to this type of policy, under the term "minimum deposit plan" is dated July 31, 1959. It notes that such plans "lend themselves to unsound and inequitable practices"; that in effect this type of financing is to provide coverage which "decreases from year to year due to the increase in the loan indebtedness while the cost of the coverage increases due to the increase in the loan interest"; but this is therefore "essentially decreasing term insurance"; and notes that the effect is to pay the agent a first year commission "which may exceed 90% of the initial cash outlay"; that existing regular policies have been replaced by these new minimum deposit policies, and that "the replacement of existing insurance by new policies is generally not in the best interest of either insured or insurer". It is noted that such replacement has in many instances been effected by "withholding from the insured information essential to a proper decision * * * an unfair trade practice and detrimental to the public interest." The regulation therefore put a limitation upon the permissible commission, required insurance companies to report first year premiums and commissions, and required the companies to issue written instructions incorporating rules and safeguards in the preparation and use of cost illustrations, comparisons, advertising and other promotional material, and to require clear presentations of the decreasing death benefits, all to the end that the company should prohibit "misrepresenting the

But from Anderson's own testimony the trial court could conclude that Anderson was unconcerned about these matters. The cross-examination of Anderson by counsel for Knox endeavored to find out his thoughts and mental attitude with respect to the suitability of this program at the time of sale. For a considerable period of his testimony Anderson evaded the question. The court intervened telling him that "counsel is trying to find out how you felt at the time of this transaction, specifically whether or not you felt that you owed a duty to protect the Knoxes against what in your opinion might be poor judgment in deciding how much insurance to take under this proposed loan financed plan." The witness evaded this question by stating that he went to the time and expense to prepare the schedules so that the Knoxes themselves could decide. Finally, however, the testimony was as follows: "The Court: Let's go over it again. From the answers you have given me, I take it that you are saying, no, that you felt you owed them no duty to protect them against any bad judgment that in your opinion they might be exercising in relation to the insurance that they had decided to purchase? The witness. I guess that's right with this qualification, that it was their responsibility to determine what they should buy and could buy. I was selling life insurance. But at the time I felt I was using the judgment of the insuring company in the amount that would be issued. As to what they decide, what they should buy, is their responsibility."

We believe that this answer alone would be sufficient to warrant the trial judge in finding that Anderson, in making his representations respecting the suitability of the program did so with reckless disregard as to whether his representation was true or false.

In this same connection Anderson's own testimony is that he did not undertake to draw up a suitable program of insurance for the Knoxes. "I didn't do any extensive planning because that was not my field. I simply submitted the policies that were applied for and they made the decision as to what they wanted to purchase." He did little personally to inform himself as to the facts relating to Knox, his income, his resources and his old insurance program before he undertook to sell the plan to him.[43]

This complete detachment is consistent with other circumstantial evidence in the record. Kreidler testified that he had attempted to argue with Anderson that the $100,000 policy was more than Knox could afford. He was told by Anderson that he, Anderson, would make that decision; but Kreidler went on to explain that one reason why he could not get along with Anderson, one point of difference with him was that he did not be-

---

terms, benefits or advantages of any policy or contract, future dividend estimates, misleading representations and incomplete comparisons." It was provided that where existing insurance was to be replaced, notice must be given to the insurer which issued the old insurance so that the insured could be advised by that company. Of course Anderson was not chargeable with knowledge that any such regulation was in the offing, but these aspects so discussed would appear to be self-evident.

43. When Kreidler first went to Knox to procure the old policies he obtained this sort of information and put it on an information sheet which he sent to Anderson.. At the same time Knox had sent the application for the insurance to New York directly from Honolulu. Anderson testified that in those cases where Knox submitted the application directly to the insurance company, it was not his, Anderson's practice to look at those information sheets. "It was technicalities that I did not check into". He said that his office staff made up the schedules and handed them to him and he proceeded to present them to Knox. "It wasn't my custom to check the information sheets." When asked what study he made in preparation for giving advice to the Knoxes, Anderson replied: "My associates at the office had Mr. Knox's policies that had been given to them and from these policies they listed the information on this schedule and I then analyzed the schedule on the way to them, looked over it carefully and then went over it in detail with Mr. and Mrs. Knox."

lieve in overselling people who could not afford to carry large amounts of insurance with large premiums. He said that it was Anderson's practice to determine the size of the new bank loan policy to be sold to a customer by ascertaining the total amount of cash values and dividends of the purchaser's old contract. The question was: what would those old contracts purchase in the way of premium? That this was the circumstance which actuated Anderson in selling the program can be inferred from the fact that after Anderson's first contact with Knox in November, 1952, it developed that Knox had other insurance with additional loan values. With this knowledge Anderson proceeded to sell the policy on the life of Ellen and the additional loan values were plowed into the new premium. It was then, as we indicated above, in discussing Van Cleve's testimony, that the total amount of insurance was raised by another $50,000.[44]

So here we have Anderson, not examining the information sheet as to Knox's financial condition, leaving it to his office staff to prepare a schedule, not undertaking himself to draw up a fit or suitable schedule, undertaking no responsibility in that regard, deciding how much insurance he would sell solely on the basis of how much could be borrowed on the old policies, and then approaching Knox who, under his directions, had been suitably prepared to accept Anderson as an expert and a specialist, and telling him that here was a suitable plan, well adapted to his means and needs. The court's finding of fraud would have appeared to have been inevitable. These circumstances alone justify a conclusion that Anderson's representation of suitability, of his honest opinion thereof, was made with

that reckless disregard of the truth which is the equivalent of intentional fraud and deceit. Indeed, an inference of an intent to cheat and deceive was warranted.

True, Anderson denied that he had represented the plan to be a suitable one. He testified: "Was it not apparent to you that they were relying upon you as a person with skill and experience specialized in bank loan plans? Is that a fair statement? A. * * * They were making their own decision. I presented the schedules and they made their own decision. I was in the business of selling insurance and told them so, that I would like to sell some insurance if there was a need for it and if they wanted it." Why the trial court disbelieved Anderson is apparent even from the cold record. His evasiveness, his lack of frankness, furnish what must have seemed to the Judge a classic example of what Judge Learned Hand described in Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269: "Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies."[45]

The trial court must necessarily have taken into consideration the considerable number of misstatements, partial statements, omissions and non-disclosures which occurred in the course of Anderson's sales talks and presentations. Of course in the process of analyzing and selling a program as complicated as this one a few wrong statements or omissions would be consistent with honest mis-

44. As Kreidler testified: "The practice was to make a calculation of the values that were in the old contracts. That would usually indicate how much new insurance a prospective client could buy."
Van Cleve testified that on a sale of the Ellen policy all but $500 of the collateral value of the old policies was used up.

45. After many pages of questioning, plaintiff's counsel finally elicited the following equivocal testimony: "Did you express a judgment that it was a suitable plan for them or an opinion? A. Oh, I may have expressed an opinion as a salesman, yes. I believe in insurance and I believe it was necessary and they believed it was necessary. There was a meeting of minds."

·takes; but here the trial court had before it so many of these misstatements and nondisclosures that it was justified in concluding that the opinion of suitability was not an honest one.[46]

As this court stated in Midstates Insurance Co. v. American Fidelity Cas. Ins. Co., 9 Cir., 234 F.2d 721, 729, "[O]ne who undertakes to make statements under circumstances such as this, is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those statements. 'If he speaks at all he must make a full and fair disclosure.'" This is particularly true where one party to a deal, though in no sense a fiduciary, is possessed of superior knowledge as to facts material and important to the transaction which he fails to disclose to the other party. This duty of full disclosure has been noted in the Hawaiian decisions.[46a]

■ With a record such as this we find it impossible to hold clearly erroneous the finding of the trial judge that Anderson's expressed opinion of suitability was not an honest one but was made fraudulently and with intent to deceive; particularly because the facts clearly warrant a determination that Anderson made his representations recklessly in disregard of whether they were true or false.

The court could fairly infer from the circumstances here that Anderson's sole interest was in collecting his immense commission; that he felt no responsibility whatever, as he himself indicated, with respect to the truth or falsity of his representation of suitability. Indeed, the court might well regard seriously the argument that any insurance agent who would sell a man with Knox's limited income and prospects an insurance program that involved saddling him with a bank indebtedness of $125,000, an essentially term insurance type of protection, and dissipation of the accumulated cash values of his old insurance, must have known

46. The use of a 40% bracket in preparing the November, 1952, schedule, (Exhibit 4) might be an error or oversight. But when the same inappropriate percentage figure is made the basis of the calculations in the May, 1953, schedule, (Exhibit 8) ·and again in Exhibit 10B the following September, the Judge could well conclude that Anderson just didn't care.

Also, there was a mistake in the amounts borrowed. Anderson's contact with the bank borrowed $3788 more than needed, and these amounts are included in the schedule Exhibit 10B. Yet this was never discovered by Anderson until the eve of the trial, a rather surprising proof of inattention. What inference was the judge to attach to the loss of the family income rider, never explained to Knox: to the statement in the letter, Exhibit 10A, that Knox was paying $2005 a year in premiums on his old policies, when the actual amount was $671? (Anderson had the policies.) The first schedule, Exhibit 4, represented the cash values of the old policies as $9607, when in truth they were nearly $16,000. This $9607 is obtained by subtracting from $10,594, appearing near the bottom of the first column on page 800 of 159 F.Supp., the totals of the dividends there listed. The balance represents the cash values of Knox's policies. At the time that exhibit was made Anderson was not aware of a Prudential policy but it represented only a small fraction of the discrepancy.

46a. Wilcox v. Ellis, 5 Haw. 335, where the seller of stock of an ice company concealed from the purchaser his knowledge of the fact that a new ice company was about to be formed in the community, a fact which would diminish the saleability of the stock. The court found there was a duty of disclosure; that the transaction was tainted with fraud and it was set aside. Cf. Harper & James, The Law of Torts, § 7.14, p. 586: "In the first place, it has been held that although ordinarily, in the absence of special circumstances, there is no duty imposed upon one party to a transaction to speak for the information of the other, nevertheless if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lies within his knowledge. Fragmentary information may be as misleading and as deceptive as active misrepresentation, and half-truths may be as actionable as whole lies and sometimes properly be regarded as actual concealment."

that he was not acting honestly in making the sale.

We hold therefore that the record sustains the court's findings, first, as to the representation alleged; second, that the representation was false, and third, that Anderson either knew and intended it to be false, or made the representation with reckless disregard of the facts.

### Damages.

This brings us to the question of damages.

The trial court awarded Knox compensatory damages in the sum of $13,-309.98 plus interest, exemplary and punitive damages in the sum of $10,000, and damages for "grievous mental anguish and great distress of body and mind" in the sum of $2500. (See 162 F.Supp. at p. 344). As to the amount of compensatory damages the evidence showed that after Knox had received the revised schedule, Exhibit 10A, and the letter of transmittal, Exhibit 10B in September, 1953, he gave these to a friend who was an investment broker and asked his advice. This friend in turn called in an employee of Prudential Life Insurance Company who analyzed Knox's program; and in consequence of this analysis Knox sought to cancel his program. He decided that he could not go on with either of the two New York Life policies and sought to cancel those out on a basis of payment for coverage to date on a term insurance cost basis. Had Anderson been willing to agree to that and to surrender his commission, that might have been done; but Anderson refused to make any concessions purportedly on the ground that Knox had violated the stipulation which Anderson had written at the head of each schedule: "It is agreed that this schedule will not be shown, directly or indirectly, to any insurance competitor".

Knox was therefore obliged to help himself in the only way possible. His old policies had been pledged for the purpose of initiating the New York Life policies. He cancelled the program by surrendering the New York Life policies, his three Sun Life educational endowment policies, the Sun Life paid up policy, and by converting the remaining policies from limited payment forms to ordinary life. This provided the proceeds to discharge the bank loan.

At the same time Knox got a cash refund from the bank loan of $239.-74, and it was stipulated that against his costs, including the proceeds of the policies mentioned and the conversions mentioned plus interest paid to operate the Anderson program, credit was properly allowed for the cash refund and for the cost of coverage under the Prudential and the John Hancock policies in their original forms. These debits and credits, the proceeds of surrenders and conversions, the interest costs and the credits aforesaid, were stipulated. Calculated in this manner, Knox actually lost $13,-309.98. We think this amount was properly awarded as compensatory damages.

With respect to the award of exemplary damages, the rule established by the Hawaiian decisions appears to be that commonly recognized elsewhere, namely, that they may properly be awarded in addition to the actual or compensatory damages where recovery is had for willful, oppressive or wanton commission of a tort. The rule was stated in Bright v. Quinn, 20 Haw. 504, p. 512 (1911), as follows: "Such damages may be awarded in cases where the defendant 'has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations' * * * or where there has been 'some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences' * * *. In such cases a reckless indifference to the rights of others is equivalent to an intentional violation of them."

It is generally recognized that actions for deceit are included in those cases in which exemplary damages may be properly awarded.[47] It is our

47. See Hobbs v. Smith, 27 Okl. 830, 115 P. 347, 34 L.R.A.,N.S., 697. Also, Waters v. Novak, 94 Ohio App. 347, 115 N.E.2d 420. (In this case, seeking re-

view that under the Hawaiian law the award of punitive damages was proper.[48]

The award for mental suffering presents more difficulty. There is in the record a substantial amount of evidence tending to show that Knox did become greatly distressed and disturbed mentally and emotionally in consequence of what had happened to him by reason of what the court has held was the fraudulent misconduct of Anderson.

The testimony was that his distress and anguish came about when he realized that he had lost a large part of the values of his old insurance policies; when he had to surrender the Sun Life policies on which he had been relying for the education of his children he suffered great distress and was continually brooding upon what then appeared to him to be an ir-

reparable loss and a terrible blow. He was difficult to live with and he was unable properly to attend to his work.

There is no doubt but that the trial court was warranted in believing that Anderson in refusing to accept a rescission of the whole arrangement attempted to aggravate the matter by writing to the vice-president of the New York Life Insurance Company advising that company that he, Anderson, was not disposed to cooperate in any way with the reduction of the insurance for the Knoxes, and recommending that no refund be made to them and that they not be given any special consideration.[49]

As noted by the text writers and in the more recent revisions of the Restatement of the Law of Torts, the rules relating to recovery for emotional distress,

covery for deceit, the court submitted to the jury the question of awarding exemplary damages by an instruction stating: "Malice consists of bad motive or such wanton and reckless disregard of the rights of others as to show evil intent." Upon appeal from a judgment including exemplary damages, the court approved that instruction; and in discussing what constituted active malice quoted from Gott v. Polsifer, 122 Mass. 235, 239, its statement that such malice "may consist either in direct intention to injure another, or in reckless disregard of his rights and of the consequences that may result to him." To the same effect see Finkee v. Boyer, 331 Mo. 1242, 56 S.W.2d 372, and Landriani v. Lake Mohawk Country Club, 26 N.J. Super. 157, 97 A.2d 511.

48. This case was tried before Hawaii had become a state. The trial judge, if not required to accept the Hawaiian decisions under Erie Railway Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, was required to do so under the same principles which were laid down in Waialua Agr. Co. v. Christian, 305 U.S. 91, 109, 59 S.Ct. 21, 83 L.Ed. 60. See also Glover v. Fong, 40 Haw. 503; Howell v. Associated Hotels, 40 Haw. 492; and Jendrusch v. Abbott, 39 Haw. 506.

49. After Knox had taken up with the New York Life the question of cancelling his policies and getting out of the deal as cheaply as possible, the Company's vice-president evidently made inquiry about

the matter. On November 6, 1953, Anderson wrote the vice-president at great length giving his version of the sale of insurance to Knox. Besides stating that it was Knox and his wife who had made up their own minds about the size of the insurance policies and blaming Kreidler for procuring the applications for the insurance, Anderson told how he had recently discovered by chance that Knox's papers, including letters from Anderson, had gotten into the hands of the Prudential Life Insurance Company's agent. He said that he then talked to Knox who admitted that this was in violation of the agreement stated on the schedules. He said in his letter: "Now I don't feel disposed to cooperate in any way in the reduction of insurance for Mr. and Mrs. Knox. And from the correspondence, the photostats of the schedules and other information I am sure that you will concur that this insurance was placed by us and accepted by Mr. and Mrs. Knox in good faith. * * * It is most unfortunate that these people have permitted themselves to be jockeyed into such a position by the critics whose actions are prompted by jealousy and lack of knowledge concerning the 'modus operandi' of my program. * * * Under the circumstances, Dudley, I cannot recommend that any refunds be made to these people and humbly state that it would be a miscarriage of justice if any special consideration were given to them over anyone else, especially in view of the methods by which they have proceeded to handle the situation."

whether accompanying trauma or other injuries, or otherwise, are in a developing and changing area of law. It is noted in the 1948 revision of the Restatement: "This is a part of the law of torts in which real developments have occurred in recent years and this development is continuing." Accordingly the American Law Institute in that revision changed the rule formerly stated on this subject and made the restatement now appearing in § 46 as follows: "One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it."

Harper & James, (§ 18.4) noted that "There has been an extension of liability along this line in recent years." In the case of United States v. Hambleton, 9 Cir., 185 F.2d 564, 566, 23 A.L.R.2d 568, this court had occasion to discuss at some length the reason for the 1948 revamping of § 46 of the Restatement of the Law of Torts, in connection with our discussion of the law of the State of Washington and that court's adoption of the new attitudes of the courts upon the question of a recovery for damages for emotional distress. The Hawaiian Supreme Court has gone along with these more recent advances. The leading case is Fraser v. Blue Cross Animal Hospital, 39 Haw. 370. There the court noted the early decisions refusing remedy for mental suffering unless the same was connected with other injuries suffered from an independent tort. The court then said (p. 373): "The modern cases recognize that the intentional infliction of mental suffering may, standing alone, constitute a tort

and serve as the basis for an independent action. This is set forth in Restatement, Torts, § 312, as follows: 'If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is a legal cause. * * *' An excellent discussion of the intentional infliction of mental suffering as a 'new' tort in itself is contained in 37 Mich.L. Rev. 874. It contains a full discussion of the authorities and the statement * * * that 'The rule that damages cannot be recovered for mental suffering unaccompanied by physical injury is not applicable when the wrong complained of is a *willful* one intended by the wrongdoer to wound the feelings and produce mental anguish and suffering, or from which such result should be reasonably anticipated as a natural consequence.' " [50]

We have here then a case of an intentional tort in the sense that the defendant acted in reckless disregard of the rights of the plaintiff. In the language of Bright v. Quinn, supra, such reckless indifference was equivalent to an intentional violation of such rights. The question is whether such conduct on the part of the defendant as the trial court has found him guilty of, actually caused and was calculated to cause severe emotional distress to the plaintiff; and whether the trial court could properly hold that such conduct was both unreasonable and such that the defendant could recognize as likely to result in mental distress and illness.

50. In that case the plaintiff sought recovery for mental suffering alleged to have been inflicted upon her because of numerous telephone calls to her residence demanding payment of sums which she did not owe. The court held that the complaint was defective for failure to allege that the acts of the defendant were unreasonable or beyond the bounds of decency so that the defendants should recognize such acts as likely to result in the illness of the plaintiff. The holding was simply that a demurrer to the complaint should have been sustained. The case was remanded for further proceedings. We assume that on such remand the court would permit amendments to correct the defective pleading so as to state a case for the recovery for mental suffering which the court held as above indicated, would be properly recoverable if the act was intentional, unreasonable and one such as should be recognized as likely to result in illness.

The trial court had the right to view the acts and conduct of Anderson in their entirety as a part of a plan to collect a large commission with reckless disregard of what the proposed program would do to Knox, and particularly to Knox's existing insurance policies. A part of the whole picture of Anderson's conduct was his letter to the New York Life Insurance Company's vice-president, above referred to, and its manifest effort to prevent Knox from extricating himself at minimum expense from the situation in which he had been placed. The court could rightfully regard that last act of Anderson as a further willful and intentional effort to disadvantage Knox. We think the court could fairly say that in all this Anderson should have known that Knox would be greatly distressed and upset over the loss of those resources on which he was counting for the education of the children.

We hold that the award of damages for mental suffering must be sustained.

The judgment is affirmed.

CHAMBERS, Circuit Judge (concurring).

The foregoing exhaustive opinion gives me no trouble as to liability. In short, I regard it as a reasonable inference that the multiplicity of figures given to Knox were not intended to enlighten but were intended to put a film of sweet lusciousness over the shell of a bitter cocoanut.

As to the element of damage for mental suffering, I cannot yet say I am satisfied with the American Law Institute's work in the field. Some day I may be. Fraser v. Blue Cross Animal Hospital, 39 Haw. 370, convinces me, in a diversity case, I should concur in the allowance for that item. In another case from another state, the question will have to be reexamined.

If history repeats itself, many good insurance men will be encouraged to be alarmed that this decision puts their livelihood in jeopardy. There is no reason to think so. The answer is: "Read the facts—if you have a full hour to do so."